# In the United States Court of Federal Claims

### No. 18-1322C
### Filed: October 31, 2020

* * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| CHRISTOPHER R. GREGORY, | * |
| Plaintiff, | * |
| v. | * |
| UNITED STATES, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Military Pay; Disability; Veterans Administration Schedule for Rating Disabilities; Cross-Motions for Judgment on the Administrative Record; Remand; Standard of Review.**

**Jason E. Perry**, Law Office of Jason Perry LLC, Wellington, FL, for plaintiff.

**William P. Rayel**, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, Civil Division and **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division. Of counsel was **Major Gregory J. Morgan**, Litigation Attorney, Air Force Legal Operations Agency, Joint Base Andrews-Naval Air Facility, MD.

## O P I N I O N

<u>**HORN, J.**</u>

In the above-captioned case, plaintiff, Christopher R. Gregory, a former Captain in the United States Air Force, filed a complaint in the United States Court of Federal Claims which alleges that the Air Force made an incorrect determination of plaintiff's 20% disability rating under the Veterans Administration Schedule for Rating Disabilities (VASRD) when he was discharged from the Air Force on August 28, 2012. Plaintiff alleges that defendant acted in an arbitrary and capricious manner when it failed to consider relevant evidence to determine plaintiff's appropriate disability rating at the time of his separation from service, and the various levels of review by the military also failed to consider the same relevant evidence. Plaintiff seeks damages based on a revision of the alleged, incorrect, rating determination, in addition to costs, attorney's fees, and any other relief this court deems just and proper.

**F I N D I N G S   O F   F A C T**

According to the Administrative Record before this court, plaintiff entered into service with the Air Force on May 31, 2006. Plaintiff was assigned to Barksdale Air Force Base in Louisiana, based on references in the record to the "2d Medical Group BAFB" in the Medical Evaluation Board (MEB) Report, discussed below. On February 1, 2010, plaintiff reported to the Flight Medicine Clinic that he had been suffering back pain for approximately 3 months. The Flight Medicine Clinic referred plaintiff to physical therapy and to radiology to receive medical testing. The radiology tests indicated that plaintiff suffered from sacroiliac joint erosions which was "suggestive of ankylosing spondylitis or other spondyloarthropathies." (capitalization in original). Plaintiff then was referred to Dr. Thomas Pressly,[1] a rheumatologist, whose assessment on March 23, 2010, confirmed that plaintiff was suffering from Ankylosing spondylitis.[2] Subsequently, plaintiff was referred to a MEB, an informal board, the purpose of which was to create a report evaluating the service member's medical condition.[3] The final MEB Report on Mr. Gregory included a "NARRATIVE SUMMARY (CLINICAL RESUME)" and attached additional documents, including five progress notes written by Dr. Pressly from March 23, 2010, April 7, 2010, May 5, 2010, June 3, 2010, and July 15, 2010, the duty limiting report

---

[1] There is no indication in the record that Dr. Pressly was an Air Force doctor. Dr. Pressly's letterhead in the record before the court indicated that his office was located in Shreveport, Louisiana, approximately 10 miles away from the Barksdale Air Force Base.

[2] Ankylosing spondylitis is defined by the Mayo Clinic as "an inflammatory disease that, over time, can cause some of the small bones in your spine (vertebrae) to fuse. This fusing makes the spine less flexible and can result in a hunched-forward posture. If ribs are affected, it can be difficult to breathe deeply." Ankylosing spondylitis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 (last visited Oct. 31, 2020).

[3] As explained on the MEB page of the Military Health System website:

> The MEB is considered an informal board because, by itself, it does not drive any personnel actions. The findings of the MEB are referred to the Physical Evaluation Board (PEB), which formally determines fitness for continued service and eligibility for disability compensation. The MEB is convened once the medical retention decision point is reached or when the Service member's physician thinks the Service member will not be able to return to duty for medical reasons. The board evaluates a Service member's medical history and condition, documents the extent of the injury or illness, and decides whether the Service member's medical condition is severe enough to impede his/her ability to continue serving in a full duty capacity.

Medical Evaluation Board, Health.mil, https://www.health.mil/Military-Health-Topics/Conditions-and-Treatments/Physical-Disability/Disability-Evaluation/Medical-Evaluation (last visited Oct. 31, 2020).

dated April 28, 2011, the April 29, 2011 "Commander's Recommendation for Medical Evaluation Board" written by Lieutenant Colonel Edwards, plaintiff's May 3, 2011 memorandum to the MEB, the MEB Narrative Summary dated March 3, 2011, and the Impartial Review Request form dated May 6, 2011. (capitalization in original). The MEB initially dictated and transcribed its Narrative Summary on March 15, 2011. The Narrative Summary was subsequently amended on April 13, 2011, then amended for the second and final time, and issued on May 3, 2011. Therefore, the final amending of the Narrative Summary occurred approximately one year and four months before plaintiff's retirement.

The final amended MEB Narrative Summary included the results of a physical evaluation of plaintiff, which recorded a full range of motion in plaintiff's neck and confirmed the diagnosis of chronic low back pain and Ankylosing spondylitis. In its final amended Narrative Summary, the MEB listed "Chronic low back pain" and "Ankylosing spondylitis" under the heading "CHIEF COMPLAINTS," as well as "Foot and ankle pain," and "Neck pain secondary to spasm" under the "OTHER DIAGNOSES" portion of its report. (capitalization in original). The final amended MEB Narrative Summary recorded "Mid to minimal" pain (rated at a value of 1 to 2 out of 10) for all motions related to plaintiff's thoracic/lumbar, with the exception of rotations, for which the MEB recorded "mild to moderate" pain (3 or 4 out of 10). The final amended MEB Narrative Summary recorded "minimal to mild" (rated at a value of 1 to 2 out of 10) for motions related to plaintiff's active hip range of motion. The "PERTINENT REVIEW OF SYSTEMS" portion of the final amended MEB Narrative Summary indicated that plaintiff had no pain, stiffness or muscle spasms in his neck. (capitalization in original). The final amended MEB Narrative Summary also assessed plaintiff as having a "[f]ull range of motion in all extremities. Strength is normal throughout. No cyanosis, clubbing, or edema noted" and that plaintiff had "[n]ormal reflexes in all extremities." The final amended MEB Narrative Summary noted in the category of "General" under the "PERTINENT REVIEW OF SYSTEMS" section of its Narrative Summary that, "[t]he patient reports feeling fine, stating that his back has been feeling good. He has had no flare-ups and no symptoms." (capitalization in original). Under the section of the final amended MEB Narrative Summary titled, "IMPAIRMENT FOR MILITARY OCCUPATION/ RECOMMENDATIONS," the MEB concluded: "The patient is an experienced and valued asset to the United States Air Force. His condition and symptoms have been successfully treated and are controlled through his current medication regimen. He is currently active and able to perform all required duties." (capitalization in original).

In addition to the Narrative Summary, the final MEB Report also included the five progress notes written by Dr. Pressly which were dated March 23, 2010, April 7, 2010, May 5, 2010, June 3, 2010, and July 15, 2010. These progress notes included a section with three options for ranking severity of pain: "Mild," "Moderate," and "Severe." (capitalization in original). The March 23, 2010 progress note did not circle any pain rating. In the progress notes from April, May and June 2010, Dr. Pressly circled "Mild" for the pain rating. In the July 15, 2010 progress note, both "Mild" and "Moderate" were circled. The final MEB Report also included letters from plaintiff's commanding officer and from plaintiff. On April 29, 2011, Lieutenant Colonel Edwards, plaintiff's commanding officer, in a letter titled "Commander's Recommendation for Medical Evaluation Board," dated April 29, 2011, wrote:

Member's condition affects the spine and other extremities. Member was initial [sic] seen due to lower back pain which was then diagnosed as ankylosing spondylitis. He also has neck stillness and pain which rheumatologist has said is part of the disease process. In a flare up, member is unable to bend and turn easily which could affect egress or ejection. Also member has foot/heel pain associated with the disease process which could affect egress. Since on treatment though, member's flare ups have decreased significantly and he feels able to perform duties. Also, member has been tasked with a PCS [permanent change of station] to a RPA (remote piloted aircraft) assignment, so if he is unable to obtain a flying waiver he should have no problem obtaining a waiver to operate RPAs.

(capitalization in original) (brackets added). On May 3, 2011, plaintiff submitted a memorandum to the MEB, in which plaintiff stated in full:

1. I am writing this letter to explain how my condition affect [sic] me and why I feel the military should retain me. I have been diagnosed with ankylosing spondylitis. I have had back stiffness and discomfort for a while but in the several months prior to being diagnosed it got extremely bad. It was to the point that I could hardly put my shoes on or walk up and down stairs without having something to hold onto. Getting up and down from a chair also required holding the desk to help support my weight. The reason I state this is not to show how bad it is but that during this time before I realized this was probably something that a doctor needed to look at, I still continued to perform my duties (even while in pain). Once I was seen by my PCM [Primary Care Manager] and they realized something was going on, I was referred to a rhumeotologist [sic] where I was diagnosed with ankylosing spondylitis. The rhumeotologist [sic] also said that my neck stiffness/pain and foot/heel pain that I often had in the mornings was related to the akylosing [sic] spondylitis and was just part of the disease process. Since starting the medications, my symptoms have considerable [sic] improved and I have not had any of the extremely debilitating symptoms. The doctor and I have also been trying to keep the amount of medications to a minimum to try and help with being on approved medications.

2. Currently, I fly in an aircraft with multiple crew members and there are always two pilots on board. Ankylosing spondylitis is not the type of disease that is going to all of the sudden incapacitate me. I don't see why I should not be able to perform normal flight duties. Also, if for some reason I am unable to obtain a flying waiver, I am also pending an assignment to RPAs [Remote Piloted Aircrafts] which is flying from a computer. There should be no reason that I am unable to perform that job.

(capitalization in original) (brackets added).

Following the finalization of the MEB Report, plaintiff was referred to an Informal Physical Evaluation Board (PEB) on May 11, 2011. Plaintiff's records before the Informal PEB consisted of the documents included with the final MEB May 3, 2011 Report. On June 8, 2011, the Informal PEB determined from the record before it that plaintiff's physical condition resulting from Ankylosing spondylitis, as detailed in the final MEB Report, rendered plaintiff unfit for service. In the remarks section of its report the Informal PEB summarized, as follows:

> The service member's (SM) medical condition prevents him from reasonably performing the primary flying duties of his AFSC [Air Force Specialty Code]. The SM has chronic back pain secondary to ankylosing spondylitis with associated neck pain and stiffness, as well as foot and heel pain. He has decreased thoracolumbar range of motion on forward flexion from 0-65 degrees. His condition requires the long-term use of high risk immunosuppressant medication (Humira), which places him at risk of complication of infections, and limits his ability to deploy. His condition is not compatible with the rigors of military service. The Commander notes that flare ups in his condition would prevent the SM from bending and easily turning which could affect egress. The SM has restrictions to include avoidance of high impact activity (e.g. running, jumping, marching), and will need routine monitoring for drug toxicity and other side effects. The Informal Physical Evaluation Board finds the SM unfit and recommends discharge with severance pay with a disability rating of 10% IAW [in accordance with] the Veterans Administration Schedule for Rating Disabilities [VASRD] guidelines.

(capitalization in original) (brackets added). The Air Force is required to use the VASRD to determine a service member disability rating. See 10 U.S.C. § 1216a (2018).[4] The Informal PEB determined that plaintiff's condition warranted a disability rating of 10% under DC 5002-5240, Ankylosing spondylitis, of the VASRD.

Plaintiff disagreed with the findings of the Informal PEB, and on June 24, 2011 plaintiff requested an evaluation before a Formal PEB. The Formal PEB issued its findings and recommended disposition on August 15, 2011. Before the Formal PEB, plaintiff changed his previous position that his medical condition did not render him unfit for

---

[4] The VASRD, which is discussed more fully below, is organized into various systems, which are groupings of various conditions that affect particular functions of the body (such as, "musculoskeletal system," "respiratory system," "cardiovascular system," etc.). See generally 38 C.F.R. § 4.1 (2019); see also 38 C.F.R. §§ 4.71(a), 4.97, 4.104 (2019). Each system contains a comprehensive list of diagnostic codes (DC), each of which addresses a medical condition known to affect that particular system. Each diagnostic code contains multiple values of disability ratings, which increase in value depending on the severity of the medical condition addressed under that diagnostic code. See 38 C.F.R. § 4.1. Ratings are assigned in 10% increments and correspond to the approximate degree of severity of a service member's physical condition, with 10% being slightly disabled and 100% being entirely disabled. See 38 C.F.R. § 4.25 (2019).

service, due to his condition. In fact, plaintiff maintained to the Formal PEB that his medical condition did render him unfit for service and warranted a minimum disability rating of 40% for a disability retirement. Plaintiff contended that he "should be rated at least 40% disability under DC 5002 for chronic residuals of disabilities" because his condition warranted a 10% rating under "DC 5240 Neck," a 10% rating under "DC 5240 back" and a 21.9% rating[5] under "DC 5271 Bilateral Ankles," which when combined using the VASRD combination formula would result in a 40% rating.[6] (capitalization in original).

The evidence before the Formal PEB included the MEB Report, as well as November 3, 2010 "**OBSERVATIONS**" from the Flight Surgeon's Office, the Informal PEB findings, and a more recent August 1, 2011 letter from Dr. Pressly detailing plaintiff's then, current condition. (capitalization and emphasis in original). In addition, the Formal PEB heard testimony from the plaintiff on his condition. The November 3, 2010 "**OBSERVATIONS**" by the Flight Surgeon's Office, included as an exhibit to the Formal PEB's report, stated:

> Member has been recommended for PRP [Personnel Reliability Program] suspension since 16 Jul 10 due to use of medication with significant risk of adverse effects that can impact PRP duties (increased risk of infection, muscle cramps, fainting, confusion, numbness, subdural hematoma [bleeding around the brain], tremor). He has been suspended for 111 days and has noticed no adverse effects to the medication. He states that he feels fit for PRP duties and the observation period is now felt to be sufficient. However, the risk does remain (less than 5%) and can occur at any time in

---

[5] Plaintiff's 21.9% rating calculation based on the Combination Table in the VASRD is not clearly set out. See 38 C.F.R. § 4.26 (2019).

[6] In the event that a service member is entitled to a disability for both legs, for both arms, or for "paired skeletal muscles," the combined rating is required also to incorporate a "bilateral factor," which consists of 10% of the raw combined score. See 38 C.F.R. § 4.26. The regulation at 38 C.F.R. § 4.26 states:

> When a partial disability results from disease or injury of both arms, or of both legs, or of paired skeletal muscles, the ratings for the disabilities of the right and left sides will be combined as usual, and 10 percent of this value will be added (*i.e.*, not combined) before proceeding with further combinations, or converting to degree of disability. The bilateral factor will be applied to such bilateral disabilities before other combinations are carried out and the rating for such disabilities including the bilateral factor in this section will be treated as 1 disability for the purpose of arranging in order of severity and for all further combinations.

38 C.F.R. § 4.26. The regulation also states that the "combination" of rating percentages does not refer to simple addition. Instead combination is a specific process prescribed in 38 C.F.R. § 4.26 for accumulating multiple disability ratings into one rating. See id.

the future. Due to ultimate PRP responsibility falling on the member, he MUST inform the CO [Commanding Officer] if any side effects occur and must immediately be evaluated by a Competent Medical Authority. This information was discussed with Capt Gregory today and he acknowledged understanding of the above.

Member was previously suspended due to use of the medication methotrexate. Potential side effects include dizziness, drowsiness, headache, vision changes, confusion, and weakness. After approximately 1 month of monitoring, he was recommended for RTD [return to duty] due to lack of adverse and impairing effects of the medication. The continued use of this medication has not previously been passed as PDI [potentially disqualifying information].

(capitalization and emphasis in original) (second brackets in original). The August 1, 2011, letter from Dr. Pressly stated:

The patient, Christopher Gregory, has bee [sic] seeing me for a condition called ankylosing spondylitis. Ankylosing spondylitis has affected the range of motion in Christopher's lower back, neck, ankles, feet and hips. His lower back has stabilized due to treatment, but still has limitation of motion and suffers stiffness in the morning. He also has pain and limited motion in neck area from spasms secondary to ankylosing spondylitis. Christopher also has enthesitis which affects his ankles and heels. Motion is limited in ankles and feet due to swelling and guarding. During normal activity both ankles have moderate limitation of motion but his left ankle has pronounced limitation of motion during a flare-up.

Initially, Christopher came in due to limited motion and severe pain. He had extreme back pain with associated pain down buttocks and leg and ankle stiffness. Christopher had an extremely hard time putting his shoes on and doing everyday activities like getting up and down from chairs or climbing stairs. During normal activity Christopher's limitation of motion has stabilized due to treatment to the point where he usually doesn't have stiffness for more than 1-2 hours in the morning or during long periods of inactivity. During a flare-up, Christopher's limitation of motion in affected joints is much more pronounced and motion is extremely painful.

(capitalization in original).

On August 15, 2011, the Formal PEB determined that plaintiff's condition warranted a 20% disability rating. The Formal PEB stated:

The Board opines that Capt Gregory should be more appropriately rated at DC 5240-5002 at 20%, based on one or two exacerbations a year in a well-

established diagnosis.[7] The Board did not find documentation of any incapacitating episodes to justify a higher rating. On 31 May 2011, NA St Pierre wrote "He denies his pain is distracting or impairing to his PRP duties" and he has remained on PRP duties consistently through his disease course.

(capitalization in original). The same day, August 15, 2011, the Formal PEB recommended that plaintiff be separated from the Air Force with a 20% disability rating, concluding that: "Capt Gregory's condition requires the long-term use of high risk immunosuppressant medication (Humira with Mobic), which places him at risk of complication of infections, and limits his ability to deploy. Capt Gregory's condition is not compatible with the rigors of military service."

Plaintiff appealed the Formal PEB's findings to the Secretary of the Air Force Personnel Council (SAFPC) on September 5, 2011. In a letter to the SAFPC titled: "Rebuttal of the Formal PEB Findings in the case of Captain Christopher Gregory," plaintiff argued that the August 1, 2011 letter from Dr. Pressly demonstrated that his condition was severe enough to merit a 40% rating. Plaintiff argued to the SAFPC that evaluating his condition on the basis of chronic residuals would have resulted in a 40% rating when taking into account pain in plaintiff's feet, back and neck, because both of plaintiff's foot and ankle joints should have warranted a 10% rating per foot for a combined disability rating of 21.9%, which when combined with a 10% rating for plaintiff's neck and a 10% rating for plaintiff's back would result in a 40% rating. Alternatively, plaintiff argued before the SAFPC:

> At the FPEB [Formal PEB], Captain Gregory testified that he has a flare of his ankylosing spondylitis at least every other month. During these flares, he testified that all of his joints suffer from additional stiffness and pain; that he suffers from gastrointestinal problems; that he suffers from fatigue and has to take naps; and that he leaves work early for 2-3 days during these flares. This demonstrates that his exacerbations are incapacitating.

(capitalization in original) (brackets added). Plaintiff argued before the SAFPC that he had not received a full medical evaluation from the MEB because the MEB had failed to consider plaintiff's foot and ankle pain and had failed to adequately consider plaintiff's

---

[7] The description of "one or two exacerbations a year in a well-established diagnosis" included in the Formal PEB's decision indicates that the 20% disability rating was based on an "active process" basis pursuant to DC 5002. See 38 C.F.R. § 4.71a (2019). Although "active process" is not explicitly defined in the regulation, a finding under DC 5002 for an active process basis describes how many incapacitating episodes per year equate to which disability percentage rating. The chronic residual framework, which cannot be combined with the active process ratings under DC 5002, assigns a 10% rating for each "major joint" or "group of minor joints affected by limitation of motion." 38 C.F.R. § 4.71a.

condition during flare ups.[8] Plaintiff also argued before the SAFPC that his disability was incorrectly rated by the Formal PEB, because the Formal PEB did not have the relevant evidence of plaintiff's condition in the record as a result of the MEB having failed to assess plaintiff's foot pain and its failure to consider plaintiff's condition on an active process basis. Plaintiff additionally argued before the SAFPC that the Formal PEB did not consider evidence demonstrating that plaintiff's condition had worsened in the time since the MEB evaluation and plaintiff's submission of his memorandum to the MEB on May 3, 2011.

On May 1, 2012, the SAFPC reached its decision, accepting the Formal PEB's findings that plaintiff was unfit for duty and that his condition warranted a rating of 20% on an active process basis. The SAFPC indicated that it had reached its decision "[f]ollowing a review of all facts and evidence in the case," including the testimony presented before the Formal PEB, the Formal PEB's findings, the Informal PEB's findings, plaintiff's service medical record, and the Narrative Summary of the MEB. In its decision, the SAFPC also indicated, incorrectly, that plaintiff was still certified on the Personnel Reliability Program (PRP).[9] The SAFPC also cited to plaintiff's own statements regarding his condition, including plaintiff's testimony at the Formal PEB hearing at which he had stated, "current medications [are] working" and flare-ups occur "once every two-three months," although, according to plaintiff, his condition had worsened since the time at the PEB review.[10] The SAFPC further stated:

> Capt Gregory's counsel requests a definition of "Incapacitating". [sic] The Board offers Note (1) from Section 4.71a of the VASRD: "For purposes of evaluations under diagnostic code 5243, an incapacitating episode is a period of acute signs and symptoms due to Intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician." It should also be noted that the VASRD defines incapacitation

---

[8] The final amended MEB Narrative Summary included "Foot and ankle pain" and "Neck pain secondary to spasm" under a section of the Narrative Summary titled "OTHER DIAGNOSES." (capitalization in original). The final amended MEB Narrative Summary also indicated under the "PERTINENT REVIEW OF SYSTEMS" section that plaintiff had no pain, stiffness or muscle spasms in his neck. (capitalization in original). Furthermore, the MEB assessed plaintiff's extremities and noted, "[f]ull range of motion in all extremities. Strength is normal throughout. No cyanosis, clubbing, or edema noted," and "[n]ormal reflexes in all extremities." "Neck is supple with full range of motion."

[9] Plaintiff was removed from the PRP on November 21, 2011, approximately five months before the SAFPC decision.

[10] Although plaintiff argued that he was fit for duty in his memorandum to the MEB, plaintiff subsequently argued the opposite at his hearing before the Formal PEB on August 15, 2011, which was after he filled the latest review of his condition by Dr. Pressly in a letter dated August 11, 2011 which showed that Dr. Pressly had changed his evaluation of plaintiff's condition.

in no less than 15 (fifteen) other areas. The commonality always being "requires bed rest prescribed by a physician and treatment by a physician.

(capitalization in original). The SAFPC agreed with the finding of the Formal PEB, which found that the evidence did not demonstrate that plaintiff's "flare-ups" were severe enough to meet the definition of "incapacitating episode."

Moreover, the SAFPC May 1, 2012 decision indicated that plaintiff's condition did not warrant any rating based on chronic residuals, finding that the evidence suggested that plaintiff's condition was "acute," not "chronic." The SAFPC wrote:

> Capt Gregory's counsel argues that "Chronic Residuals" were not included in the FPEB evaluation. This Board notes that the FPEB rated Capt Gregory's Ankylosing Spondylitis using VASRD code 5240-5002, "Arthritis rheumatoid; as an active process." The medical notes from Rheumatology address acute issues regarding "limitation of motion"; [sic] these are not chronic limitations. Chronic is usually defined, "Persisting for a long time or constantly recurring". [sic] In May 2011, Capt Gregory states he is fit for duty; in August 2011 he states flare ups are one every three months, and medications are working. Describing these symptoms as "flares" implies that they are not chronic by definition. The Board opines these statements are inconsistent with "Chronicity." [sic] Note that disabilities under code 5002 can be rated as either "an acute process" or "chronic residuals," not both. Rating the same disability (arthritis) twice under both processes would constitute pyramiding as defined under section 4.14, "The evaluation of the same disability under various diagnoses is to be avoided."[11] It does not appear that rating this disability under "chronic residuals" would result in any greater rating to the member.

---

[11] "[P]yramiding" is defined as receiving two ratings for the same condition under the VASRD. See 38 C.F.R. § 4.14 (2019); see also 38 C.F.R. § 4.7. The regulation 38 C.F.R. § 4.14 states:

> The evaluation of the same disability under various diagnoses is to be avoided. Disability from injuries to the muscles, nerves, and joints of an extremity may overlap to a great extent, so that special rules are included in the appropriate bodily system for their evaluation. Dyspnea, tachycardia, nervousness, fatigability, etc., may result from many causes; some may be service connected, others, not. Both the use of manifestations not resulting from service-connected disease or injury in establishing the service-connected evaluation, and the evaluation of the same manifestation under different diagnoses are to be avoided.

38 C.F.R. § 4.14.

Addressing the applicant's disability rating award, the Board [the SAFPC is required by law to rate a disability using criteria outlined in the Veterans Administration Schedule for Rating Disabilities (VASRD). In this case the Board opines that the most appropriate rating is (VASRD-5240-5002), with a 20 (twenty) percent disability rating, "One or two exacerbations a year in a well-established diagnosis". [sic] The next higher rating, "Symptom combinations productive of definite impairment of health objectively supported by examination findings or incapacitating exacerbations occurring 3 or more times a year," does not appear to be appropriate.

(capitalization in original). As a result of the SAFPC decision, plaintiff was separated from the Air Force on August 28, 2012 by order of the SAFPC, signed by the Chief of the Air Force Physical Disability Division, Colonel Leslie Hargett, with a 20% disability rating.

After plaintiff was separated from the Air Force, plaintiff appealed to the Air Force Board for Correction of Military Records (AFBCMR) on August 24, 2015.[12] In his application, plaintiff argued that the SAFPC decision was based on "an adverse FPEB [Formal PEB] decision" and that the SAFPC had failed to take into account "readily available evidence" with respect to incapacitating episodes that would merit an assignment of a 40% disability rating during the ten-month period between the Formal PEB hearing and the final adjudication by the agency in his case. Plaintiff further argued that the May 1, 2012 SAFPC decision failed to consider additional evidence of plaintiff's condition from the time of the Formal PEB until the time of the SAFPC decision and plaintiff's discharge, by which time plaintiff's condition had become more severe than previous examinations of his condition had indicated. To support plaintiff's argument that his condition had worsened prior to his August 28, 2012 discharge, plaintiff cited Dr. Pressly's June 22, 2012 progress note, which reads:

The patient, Christopher Gregory, has been diagnosed with ankylosing spondylitis, which is an inflammatory arthritis. This condition is a chronic condition that affects his neck, SI [sacroiliac] joints, back, feet, and ankles. It also has the potential to affect his lungs, eyes, hands, toes, and other joints. This condition requires long-term use of high risk medications. Christopher has been on several high risk medications and is currently using Humira which requires constant monitoring due to the potential side effects of the medications. The medication is an immunosuppressive drug that increases risk of infections and malignancies among other things. Christopher was presenting with symptoms including incapacitating episodes of 11-12 a year before treatment. With treatment, the condition has stabilized and now Christopher only presents with 4-5 incapacitating

---

[12] Plaintiff initially attempted to file an application with the AFBCMR on August 24, 2015. On April 27, 2016, the AFBCMR notified plaintiff that his August 24, 2015 application could not be processed as a viable application because plaintiff's Department of Defense 149 Form included an annotation which stated, "[s]ee attached petition," however, no petition was attached. The AFBCMR indicated that it could review the application once plaintiff had submitted the required petition. On June 22, 2016, plaintiff submitted a response with the required petition to the AFBCMR attached.

> episodes a year. While stabilized, Christopher still has lasting chronic affects [sic] of this disease process. This is not an acute disease process and the patient has manifested chronic symptoms associated with an active disease process. The motion in the affected joints is limited due to the nature of the condition evidenced by spasm and evidence of painful motion. The chronic nature of this condition affects Christopher's limitation of motion in his neck, back, SI joints and feet/ankles to varying degrees.

(capitalization in original) (brackets added). Dr. Pressly's June 22, 2012 progress note differs regarding Dr. Pressly's description of plaintiff's worsening condition as compared to his August 11, 2011 note, discussed above and submitted to the Formal PEB. The earlier August 11, 2011 note did not consider plaintiff's condition to be "chronic" and did not approximate the number of incapacitating episodes each year or the chronic nature of plaintiff's condition. Plaintiff contended, before the AFBCMR, that the June 22, 2012 Dr. Pressly letter should have significantly influenced the Air Force and disability discharge decision prior to his August 28, 2012 discharge, although the letter was written by Dr. Pressly after the SAFPC decision was issued. Moreover, plaintiff argued that the SAFPC should not have considered plaintiff's being on the PRP as a factor in deciding not to award a higher disability rating, and plaintiff argued that the May 1, 2012 SAFPC decision should have taken notice of plaintiff's decertification from the PRP on November 21, 2011. Thus, according to plaintiff, the SAFPC made its May 1, 2012 final decision based on incorrect information regarding plaintiff's condition. Plaintiff also stated in his application to the AFBCMR that the Department of Veterans Affairs (DVA) had assigned a disability rating of 10% "to each lower extremity for sciatic radiculopathy, based on upon the findings from the VA C&P [Compensation and Pension] exams conducted on 12 Jul 12- more than a month prior to the Petitioner's separation from the service."[13] Plaintiff argued to the AFBCMR that the rating assigned by the DVA "makes sense when one considers that the initial MEB in this case contained findings suggestive of a right sciatic radiculopathy on 3 May [20]11," in the Narrative Summary in the final MEB Report. Plaintiff alleged to the AFBCMR that the combination of the June 22, 2012, Dr. Pressly letter on plaintiff's condition and the fact that plaintiff was no longer on the PRP, should also argue that the AFBCMR should assign petitioner at least a 40% disability rating.

In preparation of the AFBCMR's 2018 decision, there were several further evaluations and reports. A September 29, 2016 report signed by Anna M. Stock, of the Air Force Personnel Center Disability Office, could not confirm whether the June 22, 2012, letter from Dr. Pressly had been submitted to the SAFPC or if it had been considered by the SAFPC between the SAFPC's decision on May 1, 2012, but prior to plaintiff's separation on August 28, 2012. Ms. Stock stated that the Air Force Personnel Center Disability Office

> cannot confirm or deny if there was further evidence submitted by the member's counsel following the initial appeal to SAFPC; nor if there was

---

[13] Plaintiff noted in his application to the AFBCMR that he also was appealing the DVA's May 28, 2013 assignment of an initial 20% rating before the DVA's Decision Review Officer. The DVA's Decision Review Officer increased plaintiff's rating from 20% to 60% on May 25, 2017.

evidence submitted, was it/was it not used during the SAFPC final review. Additionally we cannot confirm or deny if SAFPC should have sought out for any new medical evidence prior to their recommendation.

The Air Force Personnel Center Disability Office also recommended in its report that plaintiff's application to the AFBCMR be denied, on the basis that it found no error or injustice had occurred at the time of the MEB.

In a November 16, 2016 evaluation, an AFBCMR Individual Mobilization Augmentee Medical Consultant, Colonel Jimmie M. Drummond, also recommended denial of plaintiff's application for revision of his disability rating on the basis that a preponderance of the evidence available "at the time of separation" indicated that plaintiff's condition was not severe enough to warrant a disability rating over 20%. In conducting his evaluation and recommendation, Colonel Drummond considered the contents of the final MEB Report, the Informal PEB's findings, the record before the Formal PEB, the Formal PEB's findings, the record before the SAFPC's findings, and the June 22, 2012 letter from Dr. Pressly. Colonel Drummond wrote:

The medical reviewer also notes that the rating determination of 20% disability rating for AS [Ankylosing spondylitis], assigned by the Department of Veterans Affairs (DVA) under its pre-discharge program, is consistent with the Secretary of the Air Force (SAF) final determination of 20% disability rating for the applicant's AS. Based upon objective medical evidence detailed in specific spinous range of motion measurements, signs and symptoms, and limitations of this unfitting condition, the medical reviewer concurs that a higher evaluation of 40% is not justified for the thoracolumbar spine or the intervertebral disc syndrome. More importantly, records document a statement from the applicant indicating, "You informed us you had no additional evidence to submit." The medical reviewer also notes that various other physical conditions were determined to be service connected by the DVA. However, although there is acknowledgment of other associated medical complaints/conditions, some potentially related to the AS, the medical reviewer opines that none of these associated medical complaints/conditions, either singularly or in aggregate, would represent a condition(s) of such severity as to represent the cause of service termination (unfitting), and therefore, not ratable. Medical progress notes entries in 2010, while under care of Rheumatology, reveal the applicant's personal statements denying any impairment, incapacitating [sic] or distraction in regard to the Personal Reliability Program (PRP) participation. Furthermore, as documented by FPEB, the applicant testified, "current medications working", [sic] and flare-ups "once every two to three months". As noted previously, there were no documented patient accounts of, "incapacitating or distracting symptoms" identified in the service treatment records. In reference to the definition of "Incapacitation", [sic] used in the VASRD, the term is defined as "requires bed rest prescribed by a physician and treatment by a physician." In view of the medical documentation, the medical reviewer concurs with a determination that the applicant is appropriately rated at Disability Code (DC) 5240-5002, with a 20% percent

rating determination based upon one or two exacerbations a year with a well-established diagnosis. Longitudinal progress note review of Rheumatology documentation, during the actual period of evaluation and treatment and patient statements, are consistent with a favorable response to the prescribed treatment regime and there is <u>insufficient</u> supporting documentation either by patient accounts or clinical documentation of "incapacitating events" throughout the treatment course which would justify consideration of a higher disability rating for AS.

The medical reviewer notes the letter from the Rheumatologist, Dr. Pressly, dated 22 June, 2012 detailing the applicant's "incapacitating episodes of 11-12 a year before treatment and now 4-5 incapacitating episodes a year." In review of the progress notes, both pre- and post-treatment, and personal statements from the applicant, there is insufficient supportive evidence to support the frequency and severity of the applicant's condition as detailed by Dr. Pressly. In fact, the medical reviewer opines that personal statements by the applicant, throughout the period of medical treatment, imply a significantly less [sic] degree of severity from the AS without documented episodes of incapacitation. To reiterate, the DVA rating determination, dated 14 June 2013, also concurred with a 20% rating determination for AS effective 29 August 2012. Considering review of the MEB, IPEB, FPEB, and medical documentation, the medical reviewer observes no error or injustice in the assigned rating of 20% for AS under the VASRD code 5240-5002. In reference to other service connected medical conditions rated by the DVA, the department [the DVA] is authorized to rate <u>all</u> medical conditions without respect for Fitness for Duty.

Addressing the applicant's implicit request for a medical separation/retirement, the military IDES, established to maintain a fit and vital fighting force, can by law, under Title 10, United States Code (U.S.C.), <u>only</u> offer compensation for those service incurred diseases or injuries which specifically rendered the member <u>unfit</u> for continued military service and were the cause of career termination; and then only for the degree of impairment present at the time of separation and not based on future occurrences. However, operating under different set of laws, Title 38, U.S.C., the Department of Veteran Affairs (DVA) is authorized to offer compensation for any medical condition with an established nexus with military service, without regard to its proven or demonstrated impact upon a member's retention potential, fitness to serve, or the narrative reason for release from military service. The DVA is also empowered to conduct periodic reevaluations for the purpose of adjusting the disability rating award [decrease or increase] as the level of Impairment from a given medical condition may vary [improve or worsen] over the lifetime of the veteran.

(capitalization and emphasis in original) (first brackets added).

On January 18, 2017, plaintiff submitted his comments in response to the evaluations and recommendations provided by the Air Force Personnel Center Disability

Office and Colonel Drummond to the AFBCMR. In his response, plaintiff submitted thirteen clinical progress notes written by Dr. Pressly that may not have previously been in the record, because the notes generally were not previously mentioned.[14] The thirteen Dr. Pressly notes introduced by plaintiff to the AFBCMR on January 18, 2017 in his response are dated April 14, 2011, May 26, 2011, June 30, 2011, August 1, 2011, September 12, 2011, October 24, 2011, December 5, 2011, January 18, 2012, March 8, 2012, April 25, 2012, May 10, 2012, June 13, 2012, and July 25, 2012, all dated prior to the plaintiff's August 28, 2012 separation date. The thirteen Dr. Pressly progress notes, perhaps other than the March 3, 2011 progress note, differ from the collection of progress notes reviewed by the MEB and included in the MEB Report. All thirteen notes by Dr. Pressly include "FOOT/ANKLE PAIN" in the diagnosis. (capitalization in original). The diagnosis section of the progress note from June 3, 2010 references "NECK PAIN," and the nine notes from April 14, 2011, May 26, 2011, June 30, 2011, August 1, 2011, September 12, 2011, October 24, 2011, December 5, 2011, January 18, 2012, and March 8, 2012 reference "NECK PAIN SECONDARY TO SPASM" and "NECK PAIN SECONDARY TO SPASM/SPONDYLOSIS." (capitalization in original). None of the five progress notes included with the final MEB Report, have a diagnosis for foot or ankle pain and only one of the five notes referenced in the final MEB report, the June 3, 2010 progress note, included "NECK PAIN" as part of its diagnosis. (capitalization in original). All eighteen progress notes contain a section for rating pain which has three potential options: "Mild," "Moderate" and "Severe." (capitalization in original). In thirteen of the notes, Dr. Pressly circled the "Mild" option, three of the notes have both "Mild" and "Moderate" circled and two do not have any rating circled for the pain rating. The three notes which have both mild and moderate circled, on July 15, 2010, May 26, 2011, and June 13, 2012, were written before and after the MEB, Informal PEB, Formal PEB, and SAFPC decision.

In addition to providing the thirteen additional progress notes, plaintiff's January 18, 2017 submission in response to the evaluations and recommendations provided by the Air Force Personnel Center Disability Officer and Colonel Drummond further pointed out a number of plaintiff's concerns, including that the SAFPC had not acknowledged that plaintiff was no longer on the PRP and stated, in part, that:

> d. If the SAFPC staffers were aware of this fact, then it might have persuaded them to give more weight to the arguments made by previous counsel regarding both rating the Petitioner for chronic residuals of ankylosing spondylitis and determining whether he did suffer from incapacitating episodes of this disease on a regular basis.

---

[14] Of the eighteen progress notes currently in the record before the court written by Dr. Pressly, five notes, dated from March 23, 2010 to July 15, 2010, were included as part of the final MEB Report. There is a reference in the MEB Narrative Summary which addresses Dr. Pressly's findings from a March 3, 2011 visit by plaintiff with Dr. Pressly, but other than the 5 notes from March 23, 2010 and July 15, 2011, it is not clear whether any other of Dr. Pressly's notes were given serious consideration.

e. In addition, the drafter of this opinion acknowledges that there is no way to confirm whether the SAFPC was aware of any updated medical evidence that might be available from the Petitioner's treating rheumatologist.

(capitalization in original). Plaintiff's January 18, 2017 submission also stated:

i. While the treating rheumatologist's [Dr. Pressly's] note regarding the frequency of these incapacitating episodes was dated [June 22, 2012] one month after the SAFPC issued its decision [May 1, 2012], it is doubtful that his opinion would have been markedly different had this document been written prior to final agency action in this matter.

j. He also noted that the residuals of this disease affected the Petitioner's neck, back, SI [sacroiliac] joints, feet and ankles.

k. This is significant because the initial VA rating decision for this Petitioner assigned him a 10% disability rating to each lower extremity for sciatic radiculopathy, based upon the findings from the VA C&P exams conducted on 12 Jul 12- more than a month prior to the Petitioner's separation from the service.

l. This finding makes sense when one considers that the initial MEB in this case contained findings suggestive of a right sciatic radiculopathy on 3 May 11.

(capitalization in original) (brackets added) (internal citations omitted). Moreover, plaintiff's January 18, 2017 submission questioned Colonel Drummond's evaluation and recommendation, and stated:

b. In this case, it would constitute a clear and unmistakable error to reject the expert medical evidence provided by the Petitioner's treating rheumatologist in the absence of other medical evidence contradicting his statement in Enclosure Four [Dr. Pressly's June 22, 2012 letter] to the AFBMCR Petition.

c. The well-founded basis for his opinion may be established by reviewing his treatment records during the period at issue after the FPEB and prior to final agency action in this case.

d. It does not appear that either the Medical Consultant or the Special Actions Officer [the Air Force Personnel Center Disability Office] were aware that this rheumatologist continued to treat the Petitioner after the FPEB hearing and through final agency action in this case.

e. Therefore, Counsel would argue that in the absence of any clear or unmistakable bias, it is intellectually disingenuous to opine that this board-certified rheumatologist would provide a false official statement to a federal agency.

f. For this reason, the treating rheumatologist's report of the frequency of the Petitioner's incapacitating episodes, should be accepted at face value and merit the assignment of not less than a 40% disability rating for ankylosing spondylitis under VA Code 5009 as an inflammatory arthritic process.

g. In the alternative, the arguments advances [sic] by counsel in Paragraph Two above with respect to bilateral sciatic radiculopathy also provide a solid basis for placing the Petitioner on the PDRL [Physical Disability Retirement List] at a combined 40% disability rating.

h. Finally, if we accept the active disease process analysis of this condition as an inflammatory arthritic process, then the chronic residuals affecting the Petitioner's neck, SI joints and ankle groups would merit the assignment of a 10% rating for each affected area; together with a 20% rating for the back, this would provide another basis for medially [sic] retiring the Petitioner at a 40% or greater disability rating.

(capitalization in original) (brackets added) (internal citations omitted).

In response to plaintiff's submission, the AFBCMR requested an evaluation from BCMR Medical Reviewer, Dr. Horace R. Carson. On October 5, 2017,[15] Dr. Carson reviewed plaintiff's medical record, which now included the thirteen additional progress notes from Dr. Pressly, Dr. Pressly's June 22, 2012 letter, plaintiff's removal from the PRP and the record before the SAFPC and recommended a 40% disability retirement. Dr. Carson wrote:

The Medical Advisor is acutely aware that, prior to NDAA 2008 [National Defense Authorization Act], there were historical disparities between disability ratings assigned by the Military Department and the Department of Veterans Affairs; often for the same medical condition in the same individual. However, then and now, under the Legacy DES, the Military Department bases its rating and fitness decisions upon the evidence

---

[15] There is a discrepancy regarding the date of Dr. Carson's first evaluation before the AFBCMR. At the top of his report, the date "9/20/2017" appears. Above his signature at the bottom of the report, however, the date "10/5/2017" appears. The court will refer to the report using the date closest to Dr. Carson's signature, October 5, 2017.

present at the "snapshot"[16] time of final military disposition; and not on future progression of disease, illness, or injury after discharge. However, the Medical Advisor does acknowledge the possibility that some evidence, available prior to the applicant's date of separation, may not have been utilized by previous boards in their respective decision-making.

Nevertheless, the fact that the DVA made the applicant's higher rating decision effective the day after his date of discharge, would lead the uninformed to believe that the proximity to the date of discharge should be interpreted as consistent with the military's "snapshot" in time clinical disposition. However, this procedural benefit appears to have been related to the fact that the applicant had an active/open [uninterrupted] appeal of his 20% rating since its initial assignment. This reviewer also opines the decision may have been based upon some evidence gathered well beyond the applicant's date of discharge [much greater than 12 months post-discharge]; a time during which additional symptoms or exacerbations in severity could have been reported. The Department of Veterans Affairs (DVA) and the DoD Physical Disability Board of Review, both, consider the probative value of clinical events occurring during the 12 months following an individual's date of discharge.

The applicant's legal counsel would like the Board [AFBCMR] to place great weight on the letter from the applicant's treating rheumatologist, dated June 22, 2012. However, this letter was also available to the DVA in its initial 20% rating decision. Moreover, the provider's medical progress notes were not reflective of any periods of physician-directed bed rest due to *incapacitating episodes*; as also initially observed by the DVA examiner. The legal counsel also implicitly places great weight on the applicant's frequent/extended periods of PRP decertification. However, these are neither equivalent to nor indicative of *incapacitating episodes* requiring physician-directed bed rest.

If, on the other hand, the Medical Advisor and the Board considers the DRO's [Decision Review Officer] decision to place all of the applicant's musculoskeletal complaints under the overarching diagnosis of *ankylosing spondylitis,* instead of rating each separately under individual VASRD codes, as initially desired by the applicant [although may not have been individually unfitting, but collectively could be unfitting], then the more inclusive nature of the disease entity warrants consideration of increasing the applicant's disability rating to the next higher rating of 40%.

Thus, while having strong agreement with the recommendation of the previous Medical Advisor's [Colonel Drummond] assessment, this reviewer concedes, in consideration of the voracity of legal counsel's arguments,

---

[16] In the record, the term "snapshot," is used, as well as the terms "date of discharge," "date of separation," and "final military disposition," without defining what "snapshot" means, including whether that refers to the date of discharge or the date of the final military disposition.

which included the alleged exclusion of information not considered by previous boards in their respective decisions, the implicit insistence on the truthfulness of the rheumatologist's letter, and the upgrade of disability rating awarded by the DVA's DRO, made effective the day after date of discharge, the current Medical Advisor recommends retiring the applicant with a 40% disability rating as a fair compromise; albeit short of the 60% assigned by the DVA.

(capitalization and emphasis in original) (second, third, and sixth brackets in original).

On December 20, 2017, the AFBCMR sent plaintiff its initial evaluation, to which plaintiff responded on January 8, 2018, concurring with Dr. Carson's October 5, 2017 evaluation and accepting that a 40% rating would be a fair compromise. On February 16, 2018,[17] Dr. Carson wrote an addendum to his previous evaluation from October 5, 2017, again recommending a 40% disability rating. In the addendum report, Dr. Carson addressed the fact that plaintiff had "earlier argued that he was fit for retention, and appears to have vehemently defended the lack of interference with his condition with the performance of his duties" and that, "[t]he Board will also recall the applicant's treating **rheumatologist** consistently referred to his condition as '*mild*' in hand-written progress notes; although a worse clinical picture was painted in his **June 22, 2012 letter**." (emphases in original). In addition, Dr. Carson, in his addendum report, also referred to the decision of the DVA's Decision Review Officer to increase plaintiff's rating from 20% to 60% based on post-service medical evidence obtained after plaintiff's separation in 2012, in which Dr. Kevin J. Kempf, a civilian rheumatologist, stated on October 31, 2012 that plaintiff's Ankylosing spondylitis was "remarkably well controlled on Humira and doing extremely well."[18] Dr. Carson also stated in his addendum report:

However, the Medical Advisor also opines that the increased disability rating from 20% to 60% may not have been based upon worsening clinical symptoms, but simply upon a re-characterization of the extent of involvement of the *ankylosing spondylitis*; that is, inclusive of multiple other musculoskeletal complaints present in the service treatment record. Regardless, the preponderance of evidence at or about time of the applicant's discharge, indicates that his condition was "mild" in severity and "well controlled" on medications.

---

[17] There is a discrepancy regarding the date of Dr. Carson's addendum before the AFBCMR. At the top of his addendum, the date "2/15/2018" appears. Above his signature at the bottom of the report, however, the date "2/16/2018" appears. The court will refer to the report using the date closest to Dr. Carson's signature, February 16, 2018.

[18] As summarized in Dr. Carson's June 24, 2019 evaluation, the Decision Review Officer of the DVA included in his consideration several post-service medical exams and evaluations of plaintiff, including a June 22, 2016 exam, a May 25, 2017 exam, and outpatient records from the Veterans Administration Medical Center San Antonio from March 2014 to May 2017.

The Medical Advisor reminds the Board that the applicant was PRP decertified not due to his diagnosis or clinical status at a given time, but due to the risks associated with the prescribed medications. Therefore, PRP decertification should not be considered an indicator of incapacitation.

(capitalization and emphasis in original).

Plaintiff reviewed the addendum on March 11, 2018 and reiterated his belief that a 40% rating would be a "fair resolution of his case," but also asked that the AFBCMR "give seriousconsideration [sic] to the arguments advanced in our previous submissions in thismatter [sic] regarding the viability of a 60% rating for this condition and view theMedical [sic] Advisor's 40% PDRL [Physical Disability Retirement List] recommendation as the minimum rating to be awardedin [sic] this case." (brackets added).

On June 20, 2018, the AFBCMR, nonetheless, upheld the SAFPC's determination of a 20% disability rating for plaintiff, finding that "[i]nsufficient relevant evidence has been presented to demonstrate the existence of an error or an injustice." In its decision, the AFBCMR agreed with the opinions and recommendations of the Air Force Personnel Center Disability Office and Colonel Drummond and disagreed with the 40% recommendation by Dr. Carson. The AFBCMR wrote:

We note the BCMR Medical Consultant [Dr. Carson] recommends a permanent retirement with a 40 percent disability rating. Contrarily, the Medical Consultant states the applicant earlier argued he was fit for retention and now that he has been found unfit, the emphasis has shifted to a medical retirement. He also notes the applicant's treating rheumatologist consistently referred to his condition as "mild" in hand-written progress notes; although a worse clinical picture was painted in his 22 Jun 12 letter. Finally, the BCMR Medical Consultant states the decision of the DRO was, in large measure, prompted by evidence clearly obtained and considered well beyond the "snap shot" time of the applicant's discharge date. After carefully considering all the evidence in this case, to include the rheumatologist's report and the BCMR Medical Consultant's recommendation, it is our opinion the applicant's disability rating(s) were properly adjudicated and he has not provided sufficient evidence to persuade us that a change in the current 20 percent disability rating [previously assigned by the Military Department and the DVA at a time when the applicant voiced his improvement and desire for retention], is warranted. Therefore, we agree with the opinions and recommendations of the AFPC Disability Office and the BCMR IMA Medical Consultant [Colonel Drummond] and adopt the rationale expressed as the basis for our conclusion the applicant has failed to sustain his burden of proof that he has been the victim of an error or injustice. In view of the foregoing and in the absence of substantial evidence he was denied rights to which entitled, we find no basis to recommend any of the relief sought in this application.

(second brackets in original). The June 20, 2018, AFBCMR decision referenced the records and arguments of the preceding boards, Dr. Pressly's June 22, 2012 letter and progress notes, as well as the four previous evaluations: the September 29, 2016 Air Force Personnel Center Disability Office evaluation, the November 16, 2016 evaluation carried out by AFBCMR Individual Mobilization Augmentee Medical Consultant Drummond, the October 5, 2017 evaluation carried out by AFBCMR Medical Advisor Dr. Carson, and the February 16, 2018 addendum by Dr. Carson.

On August 28, 2018, plaintiff filed the current case in the United States Court of Federal Claims. Plaintiff alleges that the AFBCMR's ruling denying a correction of plaintiff's disability rating to 40% or higher was arbitrary and capricious. Plaintiff argues:

> The Air Force failed to comply with statutes and regulations and to properly conduct an MEB addressing all of Plaintiff's conditions and disabilities with the information required to accurately rate his disabilities, to properly conduct the PEB and to rate his conditions as required by law and regulation, and to properly conduct administrative appellate review prior to and after Mr. Gregory's separation from the Air Force. [19]

In response to the plaintiff's complaint, on February 15, 2019, defendant filed a motion to remand to the AFBCMR, which was unopposed by plaintiff, in order for the AFBCMR to consider whether plaintiff is entitled to a higher disability rating based on chronic residuals of his Ankylosing spondylitis. The court granted the defendant's request for a remand on February 20, 2019. The February 20, 2019 remand Order stated:

> The AFBCMR shall address, among other issues, whether Mr. Gregory is entitled to a disability rating higher than 20 percent based upon "chronic residuals" of his Ankylosing Spondylitis, and, if so, determine and explain what that disability rating should be; and determine and explain whether Mr. Gregory is entitled to any relief, including correction of records and retirement pay, based upon any errors or injustices found.

(capitalization in original).

In its October 24, 2019 decision on remand, the AFBCMR referenced a June 24, 2019[20] evaluation provided by AFBCMR Medical Consultant Dr. Carson, the same BCMR Medical Consultant who previously had performed the evaluation of plaintiff's condition

---

[19] In referencing the "PEB," it is unclear whether plaintiff refers to the Formal PEB, the Informal PEB, or both.

[20] Similar to the discrepancies described above regarding Dr. Carson's first evaluation and addendum, there was again a discrepancy regarding the date of Dr. Carson's evaluation before the AFBCMR on remand. At the top of his report, the date "6/21/2019" appears. Above his signature at the bottom of the report, however, the date "6/24/2019" appears. The court will refer to the report using the date closest to Dr. Carson's signature, June 24, 2019, to refer to the evaluation on remand by Dr. Carson.

on October 5, 2017. For his review on remand, Dr. Carson took into consideration a list of factors, including plaintiff's own statements from his May 3, 2011 memorandum to the MEB, the MEB's observations which found plaintiff to be in good condition without flare-ups, notes from Dr. Pressly from 2010 to a portion of 2012, which described plaintiff's condition as "mild," and a military service entry from September 26, 2011, which recorded that plaintiff "presented for follow-up for 'profile for back'" and "[h]is **pain scale** was recorded as '**0 Pain Free**.'" (emphases in original). In his list of factors in his June 24, 2019 report, Dr. Carson addressed several of the progress notes written by Dr. Pressly, including two dated April and May 2012, which characterized the Ankylosing spondylitis as "**mild**," and which Dr. Carson claimed were the first records which indicated "**foot/ankle pain**," although his conclusion that the April 25, 2012 note by Dr. Pressly was the first reference to foot/ankle pain was not correct. (emphases in original). The first indication of plaintiff's "foot/ankle pain" was in Dr. Pressly's April 14, 2011 progress note submitted to the AFBCMR on January 18, 2017. Dr. Carson also considered a June 13, 2012 progress note by Dr. Pressly characterizing plaintiff's Ankylosing spondylitis as "**mild symptoms**," but that progress note by Dr. Pressly also included separate diagnoses for "**Lumbago, Foot/Ankle Pain**," as well as documentation of "increased soreness of back" and "**bilateral heel pain**." (emphases in original). Moreover, in his June 24, 2019 evaluation, Dr. Carson took note of the June 22, 2012 letter from Dr. Pressly which, according to Dr. Carson, "unlike the preponderance of preceding evidence of record, remarked that *Ankylosing Spondylitis* is 'an **inflammatory arthritis**,' *chronic* in nature, that '**affects his neck, SI joints, back, feet, and ankles**'" and that Dr. Pressly "further disclosed that the applicant had previously presented with **11 to 12 incapacitating episodes per year** before treatment [year and dates not specified], and that it was reduced to **4 to 5 incapacitating episodes a year**, after stabilizing through treatment." (capitalization, brackets, and emphases in original). Dr. Carson noted that on May 28, 2013, the DVA assigned plaintiff a 20% rating, but on May 25, 2017, the DVA Decision Review Officer changed plaintiff's rating to 60%. Dr. Carson also included mention of Dr. Kempf's post-separation evaluation of plaintiff, in which plaintiff's condition was described as "remarkably well controlled on Humira."

In this last of Dr. Carson's reports on June 24, 2019, Dr. Carson offered no single recommendation to the AFBCMR, but instead presented two options from which the AFBCMR should choose. Regarding the first option, Dr. Carson wrote:

> should the Board find the letter from the applicant's rheumatologist, dated June 22, 2012, to be a plausibly accurate representation of the applicant's clinical status prior to his date of discharge, albeit inconsistent with previous trend of "mild" disease in hand-written and typed progress notes, as recent as June 13, 2012, then a minimum 40% rating should be considered.

The second option presented by Dr. Carson was to "[d]eny the petition to assign a disability rating greater than 20% as assignment of a higher rating would be inconsistent with the preponderance of clinical evidence present at the 'snapshot' time upon entering the Disability Evaluation System and at the time of final military disposition."

On October 24, 2019, the AFBCMR issued its decision after remand and confirmed the 20% disability rating upon discharge for plaintiff, endorsing Dr. Carson's second

option that plaintiff's medical condition did not warrant an increased disability rating of 40%. For its October 24, 2019 decision on remand, which was issued without a hearing, the AFBCMR issued a four-page decision, with only a two-paragraph discussion section, finding that the plaintiff was not entitled to an increase in his disability rating. The AFBCMR's October 24, 2019 decision on remand concluded in its two-paragraph analysis, in full:

> After reviewing all Exhibits, the Board remains unconvinced the evidence presented demonstrates an error or injustice to warrant a medical retirement. The Board does not believe the applicant should be entitled to a disability rating higher than 20 percent based upon "chronic residuals" of his Ankylosing Spondylitis. As such, the Board agrees with the first option noted in the Medical opinion dated 21 Jun 19, that a higher disability rating would be inconsistent with the preponderance of clinical evidence present at the "snapshot" time upon entering the DES and at the time of final military disposition. Therefore, the Board finds a preponderance of the evidence does not substantiate the applicant's contentions. Accordingly, the Board recommends against correcting the applicant's records.

> The applicant has not shown a personal appearance, with or without counsel, would materially add to the Board's understanding of the issues involved.

(capitalization in original).

Following the issuance of the AFBCMR's October 24, 2019 decision on remand, the court held a status conference with the parties and instructed the parties to file an updated Administrative Record and then to file cross-motions for judgment on the Administrative Record. Defendant filed the amended Administrative Record, followed by defendant's motion for judgment on the Administrative Record. Plaintiff filed his response to defendant's motion for judgment on the Administrative Record and cross-motion for judgment on the Administrative Record, after which defendant filed a reply and response to plaintiff's cross-motion for judgment on the Administrative Record, followed by plaintiff's reply. After briefing was complete, the court held an oral argument.

# D I S C U S S I O N

In the case currently before the court, Mr. Gregory challenges the AFBCMR's October 24, 2019 decision on remand, which confirmed the assignment of a 20% disability retirement to plaintiff. Pursuant to 10 U.S.C. § 1216a, the Secretary of the Air Force is tasked with determining a service member's disability rating upon retirement. See 10 U.S.C. § 1216a; see also 10 U.S.C. § 1203 (2018). Section 1216a of title 10 indicates how a service member's disability rating should be determined:

**(a) Utilization of VA schedule for rating disabilities in determinations of disability.--(1)** In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned--

**(A)** shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs, including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims; and

**(B)** except as provided in paragraph (2), may not deviate from the schedule or any such interpretation of the schedule.

**(2)** In making a determination described in paragraph (1), the Secretary concerned may utilize in lieu of the schedule described in that paragraph such criteria as the Secretary of Defense and the Secretary of Veterans Affairs may jointly prescribe for purposes of this subsection if the utilization of such criteria will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule.

**(b) Consideration of all medical conditions.**--In making a determination of the rating of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned shall take into account all medical conditions, whether individually or collectively, that render the member unfit to perform the duties of the member's office, grade, rank, or rating.

10 U.S.C. § 1216a (emphasis in original). The referenced disabilities rating schedule is included in Title 38, Chapter I, Part 4 of the C.F.R. See 38 U.S.C. § 1155 (2018); see also 38 C.F.R. § 4.1. According to 10 U.S.C. § 1216a, when using the disability ratings schedule, the Air Force should follow applicable interpretations of the schedule in cases issued by the United States Court of Appeals for Veterans Claims, "to the extent feasible." See 10 U.S.C. § 1216a.[21]

As noted above, the schedule is organized into various "systems," groupings of distinct conditions that affect particular functions of the body (for example, "musculoskeletal system," "respiratory system," "cardiovascular system"). See 38 C.F.R. § 4.1; see also 38 C.F.R. §§ 4.71a, 4.97, 4.104. Each system contains a comprehensive list of various medical conditions known to affect that particular system. Each medical condition has an assigned diagnostic code. See 38 C.F.R. § 4.1. As also noted above, ratings generally are assigned in 10% increments and correspond to the approximate degree of severity of a service member's physical condition. See 38 C.F.R. § 4.25. The

---

[21] Decisions of the United States Court of Appeals for Veterans Claims are reviewable by the United States Court of Appeals for the Federal Circuit, which is also the appellate court which reviews decisions on appeal issued by the United States Court of Federal Claims. See 38 U.S.C. § 7292 (2018).

percentage rating is designed to provide a numerical value reflective of the extent of a service member's disability. See id. A service member's medical condition can meet the criteria of multiple codes, in which case the Air Force is to assign a rating under whichever code provides a higher rating. See 38 C.F.R. § 4.7 (2019); see also 38 C.F.R. § 4.14. In the case of equivalent evidence between two ratings, however, the Air Force is to assign the higher rating. See 38 C.F.R. § 4.25. Should a service member have non-overlapping medical conditions that qualify for the assignment of ratings under multiple codes, then the Air Force is to combine the individual ratings into one "combined" rating using a tabulation table and formula. See 10 U.S.C. § 1216a; 38 C.F.R. § 4.25. The VASRD diagnostic code applied to plaintiff, DC 5002, is the diagnostic code for rheumatoid arthritis and provides for the evaluation and assignment of a disability rating based on a service member's overall medical condition of rheumatoid arthritis, which may affect multiple areas of a person's musculoskeletal system. See 38 C.F.R. § 4.71a. Individual diagnostic codes can contain a spectrum of disability ratings. See 38 C.F.R. § 4.1; see also 38 C.F.R. § 4.71a. Disability ratings listed within a diagnostic code have a requisite description of severity that must be found present in a service member's condition in order for that service member to receive the particular disability rating. See 38 C.F.R. § 4.1. To determine the severity of a service member's medical condition, the Air Force examines the evidence of a service member's condition in a particular body part. See 10 U.S.C. § 1216a; see also 38 C.F.R. §§ 4.1, 4.71a.

This court reviews the AFBCMR decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir.) (citing Martinez v. United States, 333 F.3d 1295, 1305, 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."); Baude v. United States, 955 F.3d 1290, 1298 (Fed. Cir. 2020); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Skinner v. United States, 219 Ct. Cl. 322, 332, 594 F.2d 824, 830 (1979); Ward v. United States, 133 Fed. Cl. 418, 427 (2017); Joslyn v. United States, 110 Fed. Cl. 372, 389 (2013); Meidl v. United States, 108 Fed. Cl. 570, 575 (2013). A Judge of the United States Court of Federal Claims noted that plaintiff must show that the decision by the Army Board for Correction of Military Records was arbitrary and capricious, contrary to law, or unsupported by substantial evidence, and that, in accordance with this deferential standard of review, the court does not reweigh the evidence, "but rather considers 'whether the conclusion being reviewed is supported by substantial evidence.' So long as the Board considered the relevant evidence and came to a reasonable conclusion, this court will not disturb the Board's decision." Riser v. United States, 97 Fed. Cl. 679, 683–84 (2011) (quoting Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983)) (emphasis in original) (citations omitted).

This standard of review is narrow. The court does not sit as "a super correction board."  Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830.  Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs."  Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir.), reh'g denied (Fed. Cir. 1993).

The United States Supreme Court, however, has indicated:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) [reh'g denied and reh'g denied sub nom. SEC v. Fed. Water & Gas Corp., 332 U.S. 747 (1947)].  We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. [281,] 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 [(1974)].  See also Camp v. Pitts, 411 U.S. 138, 142-143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (per curiam).

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (other citations omitted); see also Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) ("The agency must articulate a 'rational connection between the facts found and the choice made.' While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (citations omitted), reh'g denied, 420 U.S. 956 (1975). As a Judge of the United States Court of Federal Claims explained in Verbeck v. United States:

> The court's review in these matters is thus limited in scope and deferential in nature.  Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence.  See Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) [cert. denied, 546 U.S. 1066 (2005)]; Godwin v. United States, 338 F.3d 1374, 1378 (Fed. Cir. 2003); Heisig [v. United States], 719 F.2d [1153, 1156 (Fed. Cir. 1983)].... The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an action evincing

26

rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) [reh'g denied (Fed. Cir. 2000)].

In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it.  See Heisig, 719 F.2d at 1157 ("Under the substantial evidence rule, all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); Van Cleave v. United States, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' Skinner v. United States,...correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (third and fourth omission in original).  Moreover, as stated by a Judge of the United States Court of Federal Claims, "[t]he court's review extends to determinations related to both alleged legal error and alleged injustice, so long as the requested correction would result in a money judgment." Bonewell v. United States, 111 Fed. Cl. 129, 143 (2013) (citing Grieg v. United States, 640 F.2d 1261, 1266, 226 Ct. Cl. 260, 266 (1981) ("[T]he court cannot itself correct a simple injustice or direct a correction board to do so, without the correction implementing a money judgment.")).

In its October 24, 2019 decision on remand, the AFBCMR wrote "a higher disability rating would be inconsistent with the preponderance of clinical evidence present at the 'snapshot' time upon entering the DES [Disability Evaluation System] and at the time of final military disposition." The AFBCMR, however, offered no definition of what time constituted the "snapshot" time, although the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have issued decisions which state that a plaintiff's retirement disability rating should be determined at the time of retirement from service. See, e.g., Barnick v. United States, 591 F.3d 1372, 1381 (Fed. Cir. 2010); Ward v. United States, 133 Fed. Cl. at 431. Plaintiff was officially separated from the Air Force on August 28, 2012 under 10 U.S.C. § 1203. Section 1203 of Title 10 states:

(a) Separation.--Upon a determination by the Secretary concerned that a member described in section 1201(c) of this title is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay or while absent as described in section

1201(c)(3) of this title, the member may be separated from the member's armed force, with severance pay computed under section 1212 of this title, if the Secretary also makes the determinations with respect to the member and that disability specified in subsection (b).

**(b) Required determinations of disability.**--Determinations referred to in subsection (a) are determinations by the Secretary that--

> **(1)** the member has less than 20 years of service computed under section 1208 of this title;

> **(2)** the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence;

> **(3)** based upon accepted medical principles, the disability is or may be of a permanent nature; and

> **(4)** either--

>> **(A)** the disability is less than 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, and the disability was (i) the proximate result of performing active duty, (ii) incurred in line of duty in time of war or national emergency, or (iii) incurred in line of duty after September 14, 1978;

>> **(B)** the disability is less than 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, the disability was not noted at the time of the member's entrance on active duty (unless clear and unmistakable evidence demonstrates that the disability existed before the member's entrance on active duty and was not aggravated by active military service), or

>> **(C)** the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, the disability was neither (i) the proximate result of performing active duty, (ii) incurred in line of duty in time of war or national emergency, nor (iii) incurred in line of duty after September 14, 1978, and the member has less than eight years of service computed under section 1208 of this title on the date when he would otherwise be retired under section 1201 of this title or

placed on the temporary disability retired list under section 1202 of this title.

However, if the member is eligible for transfer to the inactive status list under section 1209 of this title, and so elects, he shall be transferred to that list instead of being separated.

10 U.S.C. § 1203 (emphases in original).

As noted above, according to the United States Court of Appeals for the Federal Circuit, "[u]nder 10 U.S.C. § 1203, the statutory provision under which [plaintiff] was discharged, the extent of a service member's disability is to be determined at the time that he is found unfit for duty and separated from the service." Barnick v. United States, 591 F.3d at 1381 (citing 10 U.S.C. § 1203) (brackets added). Judges of the United States Court of Federal Claims also have consistently found that, to establish a retirement disability rating,  a service member's medical evaluation should be captured on the date of the service member's date of separation. See Ward v. United States, 133 Fed. Cl. at 431 ("the relevant time for a determination of whether Plaintiff is entitled to military disability benefits is when Plaintiff was separated from the service."); Stine v. United States, 92 Fed. Cl. 776, 795 (2010) ("the Navy takes a snapshot of the service member's condition at the time of separation from the service"). Another Judge of the United States Court of Federal Claims remanded a case reviewing a decision of Army Board for Correction of Military Records (ABCMR) in which the ABCMR failed to consider the possibility that a service member's condition had changed between the time of the Military Board's considerations and the time of discharge. See Meidl v. United States, 108 Fed. Cl. 570, 577 (2013) (citing Ala. Aircraft Indus. Inc.–Birmingham v. United States, 586 F.3d at 1375) ("The ABCMR report also fails to document any consideration given to the possibility that Plaintiff's condition became unfitting after the MEB and PEB but before his separation from the Army. By failing to consider whether Plaintiff's sleep apnea became unfitting after the MEB and PEB evaluations but before his separation from the Army, the ABCMR acted arbitrarily and capriciously.").[22]

As discussed above, regarding plaintiff's medical conditions in the case currently before this court, the June 8, 2011 Informal PEB assigned plaintiff a 10% rating under DC 5240, "Ankylosing Spondylitis." (capitalization in original). The Informal PEB based its 10% rating on the measurements recorded of plaintiff's flexion and plaintiff's range of motion in his joints, found in the Narrative Summary issued by the MEB. Plaintiff, however, argued before the Formal PEB that he should have received a combined rating under multiple codes. Plaintiff advocated that he should have been assigned a 10% rating for his back under DC 5002-5240, a 21.9% rating for both ankle and feet joints under DC

---

[22] The court notes that in an unpublished decision, the United States Court of Appeals for the District of Columbia indicated that although a retired veteran's condition had worsened since separation, the date of separation was the relevant date for determining a retired veteran's disability rating. Schmidt v. McPherson, 806 F. App'x 10, 12 (D.C. Cir. 2020) (citing Stine v. United States, 92 Fed. Cl. at 795).

5271 and a 10% rating under DC 5240 for his neck. Thereafter, the Formal PEB assigned plaintiff a 20% rating under DC 5002-5240 for the general disease of rheumatoid arthritis, accounting for plaintiff's overall musculoskeletal condition. The AFBCMR's decisions on June 20, 2018 and October 24, 2019 agreed with the August 15, 2011 Formal PEB decision and the May 1, 2012 SAFPC decision to rate plaintiff at a 20% disability under DC 5002-5240[23] for Ankylosing spondylitis, which is included in 38 C.F.R. § 4.71a, titled, "Schedule of ratings- musculoskeletal system." <u>See</u> 38 C.F.R. § 4.71a (capitalization in original). DC 5002 corresponds to the ratings for "Arthritis rheumatoid" and provides two methods of assessing a service member's arthritis and assigning a disability rating, active process and chronic residuals. <u>See</u> 38 C.F.R. § 4.71a (capitalization in original). DC 5002 in its entirety reads:

> 5002 Arthritis rheumatoid (atrophic) *As an active process:*
> > With constitutional manifestations associated with active joint involvement, totally incapacitating ………………………… 100 [%]
> > Less than criteria for 100% but with weight loss and anemia productive of severe impairment of health or severely incapacitating exacerbations occurring 4 or more times a year or a lesser number over prolonged periods …………………… 60[%]
> > Symptom combinations productive of definite impairment of health objectively supported by examination findings or incapacitating exacerbations occurring 3 or more times a year …………… 40[%]
> > One or two exacerbations a year in a well-established diagnosis …………………………………………………………………… 20[%]
> For chronic residuals:
> > For residuals such as limitation of motion or ankylosis, favorable or unfavorable, rate under the appropriate diagnostic codes for the specific joints involved. Where, however, the limitation of motion of the specific joint or joints involved is noncompensable under the codes a rating of 10 percent is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under diagnostic code 5002. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion.
> > NOTE: The ratings for the active process will not be combined with the residual ratings for limitation of motion or ankylosis. Assign the higher evaluation.

---

[23] According to 38 C.F.R. § 4.27 (2019): "With diseases, preference is to be given to the number assigned to the disease itself; if the rating is determined on the basis of residual conditions, the number appropriate to the residual condition will be added, preceded by a hyphen. Thus, rheumatoid (atrophic) arthritis rated as ankylosis of the lumbar spine should be coded '5002–5240.'" In the regulation at 38 C.F.R. § 4.71a, DC 5002 outlines the requirements for differing levels of disability ratings under rheumatoid arthritis, and DC 5240 is the residual condition in plaintiff's case, "Ankylosing spondylitis." Plaintiff's rating code was DC 5002-5240, as assigned by each preceding Board.

38 C.F.R. § 4.71a (capitalization and emphasis in original) (brackets added). The VASRD diagnostic code at DC 5002 provides a means for evaluating and assigning disability ratings for conditions that may or may not be ratable under other codes, which it does by considering the overall condition of a service member's musculoskeletal system. See id. The VASRD diagnostic code at DC 5002 utilizes two distinct mechanisms for assigning ratings based on a service member's overall condition: chronic residuals and active process. See id. For active process, ratings are assigned by comparing the service member's overall physical condition with a system, detailed in full above, that outlines staged intervals of 20%, 40%, 60% and 100% disability ratings. See id. The chronic residuals aspect of the VASRD diagnostic code at DC 5002 is established by reviewing the different areas of the body afflicted by a medical condition and then combining the ratings for each individual joint or joint group affected. See id. Ratings of 10% for each "major joint or group of joints affected by limitation of motion" are combined to calculate a service member's chronic residuals rating. See id. The chronic residuals ratings may not be combined with the active process ratings. See 38 C.F.R. § 4.71a. DC 5002 does not define "chronic residuals," "active process" or "incapacitating exacerbations." See id.

In plaintiff's case, the AFBCMR did not include a source or definition for "chronic residuals," "active process," or "incapacitating exacerbations" in either of its decisions as part of the AFBCMR's calculation of the rating for plaintiff. Both Colonel Drummond and Dr. Carson endorsed a definition of incapacitating episodes provided by the SAFPC, in which "incapacitating episodes" required bed rest. Colonel Drummond stated in his November 16, 2016 recommendation to the AFBCMR, "[a]s noted previously, there were no documented patient accounts of, 'incapacitating or distracting symptoms' identified in the service treatment records. In reference to the definition of 'Incapacitation', used in the VASRD, the term is defined as 'requires bed rest prescribed by a physician and treatment by a physician.'" Dr. Carson stated, in his first October 5, 2017 recommendation to the first AFBCMR, that plaintiff's "provider's medical progress notes were not reflective of any periods of physician-directed bed rest due to *incapacitating episodes*." (emphasis in original). Within the SAFPC decision, the SAFPC stated that it derived the definition of "incapacitating episodes" from DC 5243, a diagnostic code, although one unrelated to plaintiff's condition, but which contains the only definition of "incapacitating" in 38 C.F.R. § 4.71a, which covers the musculoskeletal system. The VASRD diagnostic code at DC 5243, but not the VASRD diagnostic code applied to plaintiff's case, states: "For purposes of evaluations under diagnostic code 5243, an incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician." 38 C.F.R. § 4.71a. In justifying using the bed rest requirement applied to plaintiff's case to define incapacitation, the SAFPC wrote, "[i]t should also be noted that the VASRD defines incapacitation in no less that 15 (fifteen) other areas. The commonality always being 'requires bed rest prescribed by a physician and treatment by a physician.'" The June 20, 2018 AFBCMR decision adopted the rationale indicated in Ms. Stock's report and Colonel Drummond's evaluation, stating "we agree with the opinions and recommendations of the AFPC Disability Office and the BCMR IMA Medical Consultant" who recommended denial of plaintiff's request and indicated that bed rest is a requirement for an incapacitating episode, "and adopt the

rationale expressed as the basis for our conclusion the applicant has failed to sustain his burden of proof that he has been the victim of an error or justice."

The VASRD diagnostic code at DC 5002, however, does not include a bed rest requirement, nor does it define incapacitation. Moreover, neither the June 20, 2018 AFBCMR decision, nor the October 24, 2019 AFBCMR decision, offer a definition for "chronic residuals" or for "active process." The May 1, 2012 SAFPC offered a definition of "chronic" as "[p]ersisting for a long time or constantly recurring" and wrote, "[i]n May 2011, Capt Gregory states he is fit for duty; in August 2011 he states flare ups are one every three months, and medications are working. Describing these symptoms as 'flares' implies that they are not chronic by definition. The Board [SAFPC] opines these statements are inconsistent with 'Chronicity.'" (brackets added). The SAFPC also did not define "active process." The SAFPC did state that "active process" was more appropriately correlated with "an acute process." The VASRD diagnostic code at DC 5002 makes it evident, however, that it is not possible for a service member to receive a rating on both "chronic residuals" and "active process" bases. See 38 C.F.R. § 4.71a. The provision requiring the basis with the higher rating to be applied acknowledges the possibility that a service member's condition might meet both bases. See id. ("The ratings for the active process will not be combined with the residual ratings for limitation of motion or ankylosis. Assign the higher evaluation.").

Plaintiff argues in his cross-motion for judgment on the Administrative Record in this court that the AFBCMR June 20, 2018 decision and the AFBCMR October 24, 2019 decision on remand were arbitrary and capricious. For the purpose of the court's current review, plaintiff argues that the AFBCMR, in its October 24, 2019 decision on remand, acted arbitrarily when it confirmed only a 20% rating on an active process basis. The description of when to assign a 20% disability retirement rating under DC 5002 is for "[o]ne or two exacerbations a year in a well-established diagnosis" at the time of discharge, which for plaintiff was August 28, 2012. See 38 C.F.R. § 4.71a. As noted above, on an active process basis under DC 5002, the options for a higher than 20% rating are 40%, 60% or 100%. See 38 C.F.R. § 4.71a. In this court, as evidence in support of a 40% or 60% rating on an active process basis, plaintiff relies heavily on the June 22, 2012 letter from plaintiff's rheumatologist, Dr. Pressly. Dr. Pressly's June 22, 2012 letter describes plaintiff's condition as being "a chronic condition that affects his neck, SI joints, back, feet, and ankles." As noted above, Dr. Pressly's June 22, 2012 letter states:

> Christopher [Gregory] was presenting with symptoms including incapacitating episodes of 11-12 a year before treatment. With treatment, the condition has stabilized and now Christopher only presents with 4-5 incapacitating episodes a year. While stabilized, Christopher still has lasting chronic affects [sic] of this disease process. This is not an acute disease process and the patient has manifested chronic symptoms associated with an active disease process. The motion in the affected joints is limited due to the nature of the condition evidenced by spasm and evidence of painful motion. The chronic nature of this condition affects Christopher's limitation of motion in his neck, back, SI joints and feet/ankles to varying degrees.

In his written filings in this court and during oral argument before this court after the October 24, 2019 AFBCMR decision on remand, plaintiff contends that Dr. Pressly's June 22, 2012 letter should be sufficient to establish that plaintiff suffered from "4-5 incapacitating episodes a year" or alternatively that Dr. Pressly's June 22, 2012 letter demonstrates that plaintiff suffered from chronic residuals. Plaintiff asserts that Dr. Pressly's June 22, 2012 letter demonstrates that plaintiff's condition at the time of separation better approximates the description of "severely incapacitating exacerbations occurring 4 or more times a year or a lesser number over prolonged periods" for a 60% rating, or at least for "incapacitating exacerbations occurring 3 or more times a year" for a 40% rating, rather than the 20% previously assigned to plaintiff, namely "[o]ne or two exacerbations a year" for a 20% rating. See 38 C.F.R. § 4.71a. Alternatively, plaintiff argues that the chronic residual calculation also could be applied, and that the AFBCMR could have "found instead that each joint should have added up to a higher rating."

Plaintiff argues that neither previous AFBCMR decision explained why each AFBCMR found Dr. Pressly's June 22, 2012 description of plaintiff's condition was inaccurate or why a higher rating was not appropriate. Plaintiff also argues that the AFBCMR and this court should rely on Dr. Pressly's letters, including the June 22, 2012 letter. In his submissions, plaintiff further argues that the October 24, 2019 AFBCMR on remand failed to explain why it decided not to choose the 40% option of the two options presented by Dr. Carson. In addition, plaintiff reminds the court that the DVA awarded plaintiff a 60% disability rating, following a review process by the DVA Decision Review Officer in 2017. At the oral argument, however, plaintiff's attorney, correctly, did acknowledge that evaluations by the DVA are not binding on this court, and that some of the evaluations by the VA occurred after plaintiff had been separated from service. Plaintiff, however, strenuously argues that his condition had worsened by the time of his discharge on August 28, 2012.[24] According to plaintiff, the issue of whether plaintiff's condition had worsened from earlier agency considerations of his medical issues up to the time of discharge was not addressed by the AFBCMR in the June 20, 2018 or in the October 24, 2019 AFBCMR decisions.

The May 3, 2011 final MEB Report contains a Narrative Summary, which contains a portion of Dr. Pressly's progress notes, the last of which included a July 15, 2010 progress note, and plaintiff's May 3, 2011 memorandum to the MEB. Both AFBCMR decisions seem to have placed significant weight on this MEB Narrative Summary, which described plaintiff's condition as "mid to minimal," "mild to minimal," and "mild-moderate."

---

[24] As detailed above, when the proceedings began regarding plaintiff's medical issues, the plaintiff had argued that he should be retained by the Air Force. Subsequently, plaintiff changed his position to argue for a discharge on disability. Plaintiff notes in his cross-motion for judgment on the Administrative Record that his change in position to advocate for a higher disability rating was due to plaintiff obtaining legal counsel who made plaintiff aware of the Disability Evaluation System process rules and requirements, as a result of which plaintiff realized, given his then current, worsening medical condition, he would not be found fit for continued service.

Although some subsequent progress notes written by Dr. Pressly continued to reflect "Mild" pain severity ratings, the progress notes from April 14, 2011 to July 25, 2012 included additional diagnoses concerning plaintiff's neck and feet/ankles as well as "Moderate" pain ratings. Moreover, the May 3, 2011 MEB Narrative Summary, which included a description that stated plaintiff "reports feeling fine, stating that his back has been feeling good. He has had no flare-ups and no symptoms," stands in contrast to plaintiff's later contentions to the August 15, 2011 Formal PEB that his back condition involved flare ups, Dr. Pressly's August 1, 2011 letter, in which Dr. Pressly stated that plaintiff suffered from flare ups, and Dr. Pressly's June 22, 2012 letter, in which Dr. Pressly stated that plaintiff suffered from 4-5 incapacitating episodes per year.

Defendant argues, "[t]his Court's standard of review 'does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence.'" (quoting Heisig v. United States, 719 F.2d at 1157) (emphasis omitted in original). Defendant argues that plaintiff has failed to meet the burden of demonstrating that the AFBCMR decision on remand to keep plaintiff's rating at 20% on an active process basis was "Irrational, Unlawful or Unsupported By Substantial Evidence." (capitalization in original). The United States Court of Appeals for the Federal Circuit has written, "[s]ubstantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Strand v. United States, 951 F.3d 1347, 1351 (Fed. Cir.) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)), petition for cert. docketed (2020).

Defendant argues that both the June 20, 2018 and October 24, 2019 AFBCMR decisions were rational and provided sufficient explanation, although defendant conceded that the October 24, 2019 AFBCMR decision on remand was "certainly short and brief and that [sic] was addressing a limited issue." Defendant tries to support its position that a 20% disability retirement rating was appropriate by relying on plaintiff's memorandum to the MEB on May 3, 2011, in which plaintiff stated that before starting treatment, "he had 'extremely bad' stiffness and discomfort, but 'still *continued to perform [his] duties* (even while in pain).'" (emphasis and brackets in original). Defendant notes that plaintiff's Commander also indicated, in April 2011, that plaintiff "maintains normal work hours." According to defendant, "none of the progress notes from Mr. Gregory's treating rheumatologist, Dr. Pressly, between March 2010 and July 2012, state that Mr. Gregory suffered from 'incapacitating' exacerbations, as defined in the VASRD," which defendant also claims includes a bed rest requirement. Moreover, defendant argues that, although incapacitaing is not defined in the applicable VASRD diagnostic code at DC 5002 that was applied to plaintiff, the defintion can be inferred from "several other places [codes] in the VASRD," which define "incapacitating exacerbations" as "requires bed rest prescribed by a physician and treatment by a physician." (citing 38 C.F.R. §§ 4.71a, 4.88b, 4.97, 4.114, 4.130) (brackets added). Defendant further notes, "Dr. Pressly frequently described the severity of Mr. Gregory's symptoms as mild in his March 2010 to July 2012 progress notes." Defendant states:

> Although Dr. Pressly opined, in his June 2012 letter, that Mr. Gregory's Ankylosing Spondylitis is "a chronic condition" that affects his "limitation of

motion in his neck, back, [sacroiliac] joints and feet/ankles to varying degrees," *id.* at 38, Dr. Carson opined that Dr. Pressly's description of Mr. Gregory's clinical status in June 2012 was "inconsistent with [the] previous trend of 'mild' disease in hand-written and typed progress notes[.]" *Id.* at 271. The AFBCMR reasonably relied upon Dr. Carson's advisory opinion, particularly where Mr. Gregory was given a chance to respond to it and declined to do so. *Id.* at 266.

(capitalization and brackets in original).

As indicated, three or more incapacitating episodes per year is the standard to substantiate incapacitating and for an individual to receive a 40% disability rating under DC 5002. The defendant argues that "there was insufficient evidence that Mr. Gregory suffered any such incapacitating exacerbations due to his Ankylosing Spondylitis." (capitalization in original). Plaintiff, however, argues that:

> this term was specifically defined in several places in the VASRD, but not in the criteria in DC 5002, means that the Department of Veterans' Affairs ("DVA," or "VA") omitted this definition for a reason. If the VA specifically did not use a definition in DC 5002 that it felt necessary to define with specificity in other disabilities, it must be presumed that the VA Secretary did so for a reason, i.e., that the definition of bed rest should not apply in this instance.

Defendant responds,

> [t]he same term within the same regulation is presumed to have the same meaning. *See, e.g., Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995) (a "term should be construed, if possible, to give it a consistent meaning throughout the Act," because a court has a "duty to construe statutes, not isolated provisions."); *Smith v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994) (canons of construction apply to regulations, as well as statutes), *superseded on other grounds by*, 38 U.S.C. § 7111.

As noted above, the United States Supreme Court has found that a court will "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 44 (quoting Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. at 286). The United States Court of Appeals for the Federal Circuit has held that "[w]hen construing an agency regulation as a matter of law, we use basically the same rules we would use in construing a statute." Glycine & More, Inc. v. United States, 880 F.3d 1335, 1344 (Fed. Cir. 2018) (citing Roberto v. Dep't of Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006)). The Federal Circuit also stated that "language of related regulations" may be considered. Glycine & More, Inc. v. United States, 880 F.3d at 1344. The VASRD diagnostic codes at DC 5002 and DC 5240, which were applied  to plaintiff, however, do not have definitions of incapacitating episodes. The VASRD diagnostic code at DC 5243, which does not apply to plaintiff was, nonetheless, used to define incapacitating episodes

regarding plaintiff's rating under DC 5002 and DC 5240. <u>See</u> 38 C.F.R. § 4.71a. The approach to incapacitating episodes used by the June 20, 2018 AFBCMR, which includes a "bed rest" requirement, however, is inappropriate as applied to plaintiff's case. Given the specificity included in each individual VASRD code applied to specific medical conditions in order to determine appropriate retirement disability status, it is more reasonable to assume that the requirements and definitions in each code were specifically considered by the drafters for inconclusion in the particular regulation, or not. The VASRD codes relevant to plaintiff, DC 5002 and DC 5240, do not include the prescribed "bed rest" requirement included in other codes which reference other medical conditions. This strongly suggests that the "bed rest" requirement is not applicable to DC 5002 and DC 5240, and, therefore, is not a requirement which should have been used to define plaintiff's disability retirement percentage.

The October 24, 2019 AFBCMR chose to reconfirm that the 20% option included in Dr. Carson's report was appropriate, but the AFBCMR did not state why it rejected the higher 40% percentage, also recommended as an option by Dr. Carson, who offered no recommendation as to which one to choose. The AFBCMR decision, issued on October 24, 2019, consisted of only two brief paragraphs of conclusory discussion in a total four-page decision. The October 24, 2019 AFBCMR also did not discuss whether it found the medical evaluation in Dr. Pressly's June 22, 2012 letter before plaintiff's discharge not to be "a plausibly accurate representation," of plaintiff's then current condition. In the AFBCMR's October 24, 2019 decision after remand, it also is not apparent whether the AFBCMR's October 24, 2019 decision on remand decided on a chronic residuals rating at 20%, whether plaintiff's condition could meet the duration and severity to satisfy a rating under chronic residuals, or whether the 2019 AFBCMR rejected chronic residuals entirely in favor of an active process rating due to a lack of analysis in the decision. Both diagnoses of foot/ankle and neck spasms in the progress notes written by Dr. Pressly were included in the two letters submitted by Dr. Pressly, on August 15, 2011 and on June 22, 2012. The August 1, 2011 letter from Dr. Pressly, considered by the Formal PEB, which issued its decision on August 15, 2011, directly addressed plaintiff's limited motion in his feet due to "swelling and guarding" and limited range of motion in his neck along with neck spasms, as does Dr. Pressly's June 22, 2012 letter. As noted above, regarding his first recommended option, Dr. Carson wrote:

> should the Board find the letter from the applicant's rheumatologist, dated June 22, 2012, to be a plausibly accurate representation of the applicant's clinical status prior to his date of discharge, albeit inconsistent with previous trend of "mild" disease in hand-written and typed progress notes, as recent as June 13, 2012, then a minimum 40% rating should be considered.

The second option presented by Dr. Carson was to "[d]eny the petition to assign a disability rating greater than 20% as assignment of a higher rating would be inconsistent with the preponderance of clinical evidence present at the 'snapshot' time upon entering the Disability Evaluation System and at the time of final military disposition." Although the 2019 AFBCMR chose the latter option, the AFBCMR's terse October 24, 2019 decision did not support its decision with sufficient explanation or discussion to meet the test of "substantial evidence."

The AFBCMR's October 24, 2019 decision does not demonstrate that the 2019 AFBCMR took the defendant's request to remand, plaintiff's agreement to do so, and the court's ordered remand seriously, or that the AFBCMR gave adequate consideration to all of the evidence in the record. This is especially true, given that the defendant had requested the 2019 remand to the AFBCMR, which signaled defendant's concern about earlier medical determinations, including the 2018 AFBCMR decision. As the United States Supreme Court found, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. at 285 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). As discussed above, the United States Court of Appeals for the Federal Circuit has found there must be "substantial evidence" to support the conclusion of the AFBCMR. See Strand v. United States, 951 F.3d at 1351. A Judge of the United States Court of Federal Claims stated, "[c]orrection boards are obligated to examine relevant data and articulate a satisfactory explanation for their decisions." Ward v. United States, 133 Fed. Cl. at 427. Moreover, "'[c]orrection boards are required to make rational connections between the facts found and the choices made.'" Id. (alteration in original) (citation omitted) (quoting Rominger v. United States, 72 Fed. Cl. at 273). Another Judge of the United States Court of Federal Claims stated that if a correction board, "fails to support its decision with a reasoned explanation of an important issue, a remand is appropriate." Rominger v. United States, 72 Fed. Cl. at 273.  Given the abbreviated explanation and the absence of discussion and support in the AFBCMR's October 24, 2019 decision on remand, the court can only conclude that the 2019 AFBCMR simply reaffirmed the agency's and previous Board conclusions of a 20% disability rating without adequately reviewing and without addressing whether the medical evidence indicated that plaintiff's condition had worsened from the time of the final MEB Report on May 3, 2011 through subsequent medical reviews and the date of plaintiff's discharge on August 28, 2012. Consequently, the 2019 AFBCMR acted arbitrarily and capriciously when it failed to address whether plaintiff's medical condition previously found to be fitting for service had become unfitting, and to what degree, by the date of plaintiff's discharge. See Barnick v. United States, 591 F.3d at 1381; Meidl v. United States, 108 Fed. Cl. at 577-78; Stine v. United States, 92 Fed. Cl. at 795; see also Chappell v. Wallace, 462 U.S. at 303. Throughout the various reviews of plaintiff's condition by the Air Force, plaintiff's date of discharge has not been the focal point for determining plaintiff's medical condition in order to appropriately rate plaintiff's disability retirement percentage. The plaintiff is entitled to have a complete review on remand, which was not afforded to him during the 2019 remand to the AFBCMR. Mr. Gregory deserves a more serious review and thorough explanation of the results of that review than has been afforded to him to date. This court, therefore, unfortunately finds that the October 24, 2019 AFBCMR decision was not based on careful consideration, evidenced by sufficient explanation of the reasons for its decision. Devoid of explanation of the information in the record and why the 2019 AFBCMR, even given Dr. Carson's most recent report to the Board offering two choices of either 20% or 40% disability rating, failed to meet the minimum standards of articulating "a 'rational connection between the facts found and the choice made.'" See, e.g., Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. at 285 (quoting Burlington Truck Lines v. United States, 371 U.S. at 168).

In defendant's motion for judgment on the Administrative Record, defendant also argues that plaintiff has waived any claim concerning an insufficient MEB by failing to bring the issue before the AFBCMR during the initial appeal of the SAFPC decision. Defendant points to the statement in plaintiff's complaint in this court, which states "[t]he Air Force failed to comply with statutes and regulations and to properly conduct an MEB addressing all of Plaintiff's conditions and disabilities with the information required to accurately rate his disabilities . . . ." Defendant argues that "Mr. Gregory waived this argument because he did not allege any errors in his MEB before the AFBCMR," he only alleged errors in his MEB before the SAFPC. Defendant cites the decision of the United States Court of Appeals for the Federal Circuit in Metz v. United States for support. See generally Metz v. United States, 466 F.3d 991. In Metz, the plaintiff had brought a case before the AFBCMR regarding his less than honorable discharge and also had requested to be reinstated to the Air Force with back pay and allowances. The plaintiff in Metz, however, offered for the first time at the United States Court of Federal Claims a totally new, unrelated ground for appeal, "that his separation from the Air Force was not voluntary because he had received ineffective assistance of counsel in responding to the court-martial charges brought against him." See id. at 994-95. In plaintiff Gregory's case, plaintiff's allegations are not new and were included in his various appeals to the successive Boards, namely that his medical conditions were inappropriately evaluated and that he was inappropriately rated for disability retirement purposes by the MEB, the Informal PEB, the Formal PEB, and the 2018 and 2019 AFBCMR. The statement in plaintiff's complaint is the first clause, in a string of clauses, which expresses plaintiff's disagreement with all previous decisions not to provide to him a disability rating higher than 20%. The full statement in plaintiff's complaint to which defendant cites states:

> The Air Force failed to comply with statutes and regulations and to properly conduct an MEB addressing all of Plaintiff's conditions and disabilities with the information required to accurately rate his disabilities, to properly conduct the PEB and to rate his conditions as required by law and regulation, and to properly conduct administrative appellate review prior to and after Mr. Gregory's separation from the Air Force. The actions of the Air Force were arbitrary, capricious, contrary to law, and unsupported by substantial evidence. The Defendant's errors denied Mr. Gregory the minimum required 30% rating to qualify for military disability retirement. He should have been retired with at least a 40% rating and the evidence in his case supports a rating of 60%.

Indeed, before the SAFPC, plaintiff argued that his disability was incorrectly rated by the Formal PEB, because the Formal PEB did not have the relevant evidence of plaintiff's condition in the record as a result of the MEB having failed to assess plaintiff's foot pain, to consider plaintiff's condition on an active process basis, and to consider evidence demonstrating that plaintiff's condition had worsened in the time since the MEB evaluation and plaintiff's submission of his memorandum to the MEB on May 3, 2011. Before his first appeal to the AFBCMR, plaintiff argued that the SAFPC decision was based on "an adverse FPEB [Formal PEB] decision" and that the SAFPC had failed to take into account "readily available evidence" with respect to incapacitating episodes that

would merit an assignment of a 40% disability rating during the ten-month period between the Formal PEB hearing and the final adjudication by the agency in his case. (brackets added). At each stage of the process, plaintiff's allegations were consistent that the Air Force, at every stage of appeal, had failed to correctly evaluate his medical condition and had assigned him an incorrect disability retirement rating.  As plaintiff has placed the issues in his medical records before each Board and before this court, plaintiff's claims are not waived.

Defendant also argues, in its reply to its motion for judgment on the Administrative Record, that by not addressing in his response to the defendant's motion two additional bases for review, plaintiff has waived them, claiming that: "the AFBCMR did not err by denying Mr. Gregory an increased disability rating based upon chronic residuals of his Ankylosing Spondylitis; [and] the AFBCMR did not err by denying Mr. Gregory disability ratings for radiculopathy sciatic involvement in each of his legs[.]" (capitalization in original) (brackets added) (footnote and internal numbering omitted).  Regarding defendant's waiver argument that plaintiff did not raise the issue of chronic residuals, defendant summarized at the oral argument that:

> The remand was directed towards the chronic residuals issue and the board addressed that in its remand decision. It labeled that [the October 24, 2019 remand decision] an addendum to the record of proceedings, which indicates it was intended to supplement, not supersede, its previous decision. And in reality, that decision is not particularly relevant now because Mr. Gregory hasn't raised in his briefing any challenge to the board's determination that he shouldn't get an increased rating based on chronic residuals. This case -- and the briefing has been about the active process issue which is addressed in the first decision.

(brackets added). As the basis for its waiver argument, defendant cites Novosteel SA v. United States, 284 F.3d 1261 (Fed. Cir. 2002) and a footnote in Senter, LLC v. United States, 138 Fed. Cl. 110 (2018). The defendant, however, does not further explain how the two cases apply to plaintiff's case. In Novosteel, the United States Court of Appeals for the Federal Circuit found that an issue had been waived and not preserved on review because defendant had not raised the issue in the defendant's principal summary judgment brief when the case was before the United States Court of International Trade. See id. The Federal Circuit stated that:

> Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further, the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat this argument as waived.

Novosteel SA v. United States, 284 F.3d at 1273-74 (Fed. Cir. 2002) (emphasis in original). In Senter, LLC v. United States, the court addressed the waiver issue in a footnote which, in its entirety, states:

> In its reply brief, Senter also contends that pursuant to FAR 15.306(d)(3), the SBA had a duty to inform Senter that it "was in the process of determining whether Senter was a populated or unpopulated joint venture" when it evaluated the addendum. Senter did not raise this argument in its opening brief, and it is therefore waived. See Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 708 (2011) ("[A] party waives issues not raised in its opening brief."). And the claim lacks merit in any event because this is not a FAR Part 15 procurement and because the SBA's correspondence with Senter regarding its eligibility does not constitute a communication or discussion with the contracting officer about the merits of Senter's proposal. See FAR 15.306(d)(3) (concerning discussions with the contracting officer about a proposal's strengths and weaknesses).

Senter, LLC v. United States, 138 Fed. Cl. at 121 n.10 (internal citations omitted). Neither decision addresses the situation in plaintiff's case.

In the first place, the court's 2019 remand to the AFBCMR was broad in that the court indicated that the AFBCMR should review certain specific issues, but also review those, "among other issues." This court also stated in the remand Order: "The AFBCMR shall address all issues within its authority, including but not limited to the issues listed below, and any other pertinent issues raised by the parties in writing to the AFBCMR." Furthermore, before this court, plaintiff argued in his initial complaint that he should be found "unfit for his Ankylosing Spondylitis [and] rated at least 40% disabling under either an active process or based on limitations to each of his affected joints," which refers to a chronic residuals rating as indicated in DC 5002. See 38 C.F.R. § 4.71a (capitalization in original) (brackets added). Plaintiff's cross-motion for judgment on the Administrative Record contests the AFBCMRs' assignments of a 20% rating on an active process basis. Plaintiff's cross-motion quotes excerpts from Dr. Pressly's June 22, 2012 letter and Dr. Carson's June 24, 2019 report, both of which were before the 2019 AFBCMR and are in the record before the court, including references that plaintiff's condition was chronic and that plaintiff suffered from incapacitating episodes. Based on the consistent record before the court, whether under a chronic residuals basis or active process basis, plaintiff's claims and the issues presented to the various agency Boards and to this court by plaintiff have been whether evidence in plaintiff's medical records demonstrates that plaintiff's medical condition warranted a greater than 20% rating based on the totality of the Administrative Record. That chronic residuals or a documented exacerbation of a medical condition of plaintiff's might serve as a basis for a higher retirement disability rating under DC 5002 is not a new issue in plaintiff's case before the agency Boards or the court.

Second, although plaintiff may not have addressed the specific medical condition of "radiculopathy sciatic involvement in each of his legs" in his response to defendant's motion for judgment on the Administrative Record, the plaintiff's radiculopathy sciatic condition is referenced throughout the record, as developed through the physical examinations of plaintiff and review by the various agency Boards. Plaintiff's radiculopathy sciatic medical condition appears in the record in plaintiff's first appeal to the AFBCMR on August 25, 2015, Ms. Stock's September 29, 2016 report on behalf of the Air Force Personnel Center Disability Office, plaintiff's January 18, 2017 response to the AFBCMR's report, Dr. Carson's October 5, 2017 report to 2018 AFBCMR, Dr. Carson's February 16, 2018 addendum to his report to the 2018 AFBCMR, the June 20, 2018 AFBCMR decision, and Dr. Carson's June 24, 2019 report to the 2019 AFBCMR. This is, again, another instance in which defendant raises that plaintiff has waived an issue that has not been waived.

In the case before this court, the essence of Mr. Gregory's claims before the agency Boards and both the 2018 and 2019 AFBCMRs was that the disability rating he had received as a result of all the previous medical examinations and proceedings in his case were insufficient because each administrative medical review and Board failed to provide plaintiff with at least a 40% or higher disability rating, on an active process basis or on a chronic residuals basis, and that the Air Force had failed to take into account "readily available evidence with respect to this issue [of incapacitating episodes] during the ten-month period between the formal hearing by the FPEB and the final adjudication by the agency in this case," including the June 22, 2012 medical opinion by Dr. Pressly. The issues may have been argued using different words during plaintiff's appeals, but the issues were included as part of his medical record and were available for review at each stage when plaintiff tried to obtain a higher than 20% medical disability discharge rating. As plaintiff has consistently and properly raised the issues before the various agency Boards and the AFBCMR, plaintiff has not waived the arguments before the AFBCMR or this court.

## C O N C L U S I O N

In sum, the AFBCMR's October 24, 2019 decision after the court's remand, which denied assignment of a higher than 20% retirement disability rating, failed to consider whether plaintiff's condition had worsened between the time of his entrance into the Disability Evaluation System and his August 28, 2012 discharge, which includes Dr. Pressly's evaluation of plaintiff's medical condition on June 22, 2012. Briefly rubber-stamping previous agency decisions, and the earlier, 2018 AFBCMR decision by the 2019 AFBCMR was not sufficient. The Board did not offer adequate explanation of its choice for reaffirming the 20% rating without discussion and without offering more than an affirmative nod to previous agency decisions, especially given Dr. Carson's two options of a 20% or 40% disability retirement as appropriate to plaintiff's case at the time of separation, without Dr. Carson expressing a preference. The cross-motions for judgment on the Administrative Record are **DENIED**. Once again, the court **REMANDS** the case to the AFBCMR. Unfortunate as yet another remand is to further elongate the proceedings for plaintiff, the AFBCMR is ordered this time to consider all of the medical evidence in

the record as applied to DC 5002 and consider plaintiff's worsening medical condition up to the date of plaintiff's discharge to determine whether a 20%, 40%, or other rating is the correct retirement disability rating for plaintiff. The court will issue a separate Order to effectuate the remand to the AFBCMR.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**